1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7  UNITED STATES OF AMERICA,              Case No.  13-CR-00818 PJH

8                    Plaintiff,
                                          **ORDER ON DEFENDANTS' MOTIONS**
9          v.
                                          Re: Doc. Nos. 71, 72, 73, 77, 79, 80, 81,
10 PURVIS LAMAR ELLIS, et al.,                   82, 83, 84, 87, 89

11                   Defendants.

12

13

14         On August 5, 2015, this matter came on for hearing before the court on the

15 following motions filed by defendants Purvis Lamar Ellis, Deante Terrance Kincaid,

16 Damien Edward McDaniel, and Joseph Pennymon: motion for a bill of particulars filed by

17 Ellis (doc. no. 83); motion for a bill of particulars filed by McDaniel on behalf of all

18 defendants (doc. no. 87); motion to dismiss, or, in the alternative, for a bill of particulars,

19 filed by Kincaid on behalf of all defendants (doc. no. 72); motion for discovery and

20 disclosure of FRE 404(b) evidence and disclosure of identity of confidential informant

21 filed by Ellis, and joined by Kincaid, on behalf of all defendants (doc. no. 80); motion for

22 search and disclosure of electronic surveillance filed by Kincaid on behalf of all

23 defendants (doc. no. 89); motion to suppress eyewitness identifications filed by

24 Pennymon (doc. no. 71); motion to suppress pretrial and in-court identifications filed by

25 Ellis (doc. no. 82); motion to suppress evidence seized from search on residential

26 curtilage filed by Kincaid on behalf of all defendants (doc. no. 73); motion to suppress

27 evidence from search of Apartment 212 and for a *Franks* hearing filed by Ellis on behalf

28 of all defendants (doc. no. 81); motion to suppress evidence seized pursuant to arrest

United States District Court
Northern District of California

1   and for a *Franks* hearing filed by Ellis (doc. no. 77); motion to suppress evidence seized

2   from digital devices filed by Ellis on behalf of all defendants (doc. no. 79); and application

3   for issuance of Rule 17(c) subpoena filed by Ellis on behalf of all defendants (doc. no.

4   84).

5          Having read the parties' papers and carefully considered their arguments and the

6   relevant legal authority, and for the reasons stated on the record and set forth below, the

7   court DENIES the motions for a bill of particulars; DENIES IN PART the motion for

8   discovery and disclosure of Rule 404(b) evidence and REOPENS IN PART the motion for

9   disclosure of the identity and communications of the confidential informant; DENIES the

10  motion for search and disclosure of electronic surveillance; DENIES the motion to

11  suppress eyewitness identifications filed by Pennymon; and DENIES the motion to

12  suppress evidence seized from illegal search conducted on residential curtilage.

13         Because the court expects further briefing on the motion for disclosure of the

14  confidential informant, whose communications to law enforcement were relied upon in the

15  search warrant and arrest warrant affidavits, the motions to suppress evidence seized

16  during the search of Apartment 212, seized pursuant to Ellis's arrest, and seized from

17  digital devices remain under submission.  The motion to suppress pretrial and in-court

18  identifications filed by Ellis remains pending before the court, and will be taken under

19  submission after the parties file supplemental materials related to the transcripts of audio

20  recordings as set forth below.  The application for issuance of a Rule 17(c) subpoena

21  remains under submission, pending a determination by the court whether to grant

22  defendants' request for an evidentiary hearing.

23  **I.      BACKGROUND**

24         Defendants Purvis Lamar Ellis (aka "B.O.T."), Deante Terrance Kincaid (aka "Tay-

25  Tay"), Damien Edward McDaniel (aka "Famous" and "Lil' Dame"), and Joseph Pennymon

26  (aka "Junkie") are charged with racketeering as associates of the Sem City street gang in

27  East Oakland.  Sem City members allegedly conducted activities primarily in the

28

2

Seminary neighborhood bordered by Seminary Ave., International Blvd., 62nd Ave. and Foothill Blvd.

The indictment alleges that defendants were involved in two specific incidents in furtherance of the racketeering conspiracy.  On January 20, 2013, all defendants were allegedly involved in shooting at a victim ("Victim 1") who was waiting at a bus stop on the 5900 block of Foothill Blvd.  On January 21, 2013, defendants Kincaid, McDaniel and Pennymon were allegedly involved in assaulting and shooting Oakland Police Officer K. ("Victim 2"), then taking his guns, after the officer drove in an unmarked car into the driveway of the apartment complex located at 1759 Seminary Drive.

After police responded to Officer K.'s shooting the evening of January 21, 2013, Oakland police secured the apartment complex and obtained search warrants to search Apartments 108, 110 and 212, based on information provided by a confidential informant ("CI").  A separate search warrant for Apartment 112 and an arrest warrant for Ellis were issued that afternoon on January 22, 2013, based in part on information provided by the CI in support of the probable cause affidavits.  The search warrant and arrest warrant affidavits are subject to a sealing order issued by the court on November 18, 2014.

**A.  January 20, 2013 Shooting**

At approximately 3:45 p.m. on January 20, 2013, a witness allegedly saw two suspects run after and then shoot a man who had been waiting at the bus stop near 5912 Foothill Boulevard in Oakland.  Based on a statement given the day of the shooting, the witness was waiting at a bus stop in front of the diner at 2566 Seminary, at 3:30 p.m. Immediately before going to the bus stop, the witness was in C-Town Smoke Shop, located at 2550 Seminary Avenue at Fortune Boulevard.  While in the store, the witness saw an African American male arguing with another man.  One of the men was approximately 20 years old, 6', 170 lbs, medium complexion, faded hair with short waves on top, wearing a burgundy leather jacket, blue jeans, and sneakers that matched his jacket.  Doc. no. 82, Ex. A (Alvarez report) at REPORTS-DOCUMENTS ("RD") 0012.

United States District Court
Northern District of California

1    The witness then left the store and waited at the bus stop in front of Al's Diner (2566

2    Seminary Avenue).

3          The witness then saw another black male go into the store, about 17-20 years old,

4    5'9", medium complexion, wearing a black beanie, black hooded sweater and jeans.  He

5    kept walking in and out of the store with the first man in the leather coat.  The second

6    man was on the phone saying "Them boys around the corner," and the man in the leather

7    coat asked, "Who? The police?"  The man on the phone said yes.

8          A few minutes later, the witness saw the man in the leather jacket walk to the

9    corner of Seminary and Foothill, looking to the bus stop on the other side of Foothill,

10   where the 40 line stops.  The man in the leather jacket came back to the store and

11   nodded to the man in the black hooded sweater and they both went around the corner to

12   Fortune Boulevard.  A few seconds later, according to the witness, he saw the man in the

13   black hooded sweater ("Suspect 1") running from Fortune to Foothill Blvd., passing right

14   in front of the witness on Seminary Blvd., and holding a black semi-automatic pistol.

15   When Suspect 1 reached the corner of Foothill Boulevard and Seminary Avenue, the

16   witness saw him shooting at the 40 bus stop on the other side of Foothill Boulevard.

17         The witness went into the former Tom's Kitchen, located at 5907 Foothill

18   Boulevard, on the corner of Foothill Boulevard and Seminary Avenue.  The witness

19   looked out the window and saw a man (Victim 1) running away from the shooter (Suspect

20   1).  The witness also saw a second suspect ("Suspect 2") running toward Seminary

21   Avenue from the direction of 60th Avenue; Suspect 2 also was reported as shooting at

22   the fleeing victim.  Suspect 2 was a black male wearing a black beanie, skeleton type

23   mask that motorcyclists wear, black zip-up hoodie with white designs on front, and blue

24   jeans.  The second shooter was shooting a long gray and black handgun.  The victim fell

25   down and the second shooter ran by him. RD 0025.  The witness then saw the second

26   shooter run by the first shooter and get into the front passenger side of a white car that

27   was stopped at the light behind the karate studio on Walnut Street.  *See* Opp. to Ellis

28   Mot. Suppress Witness Identifications (doc. no. 98) at 3 n.2 and Gov't Ex. 98-3.

4

1    The first shooter ran to where the victim was, but the witness didn't remember if

2    the first shooter shot the victim when he was next to him.  The first shooter ran back to

3    the white car on Walnut and got into the backseat behind the driver.  The witness wrote

4    the license plate of the white car.  The witness described the driver of the vehicle as a

5    "black male in his 20's" who "was dark skinned with dreads past his shoulders, and he

6    had a thick mustache and a thin goatee."  Def. Ex. 82-A (Alvarez report) at RD 000013.

7    A police officer showed the witness a picture of a 2012 Dodge Avenger on her tablet

8    device, and the witness confirmed that it was the same as the vehicle that the shooters

9    fled in.  The witness heard about 15 gun shots.

10    From the license plate, the police determined that the car was a Hertz rental car

11    rented to a Laron Means.

12    **B.  January 21, 2013 Shooting**

13    **1.    Description of Incident**

14    At the July 22, 2013 preliminary hearing in the state court proceedings against

15    Kincaid, McDaniel and Pennymon, OPD Officer Eric K. testified about the events on

16    January 21, 2013 leading up to his shooting.  The parties have provided various excerpts

17    of the July 22, 2013 Preliminary Hearing transcript.  *See* Kincaid Mot. Suppress Search

18    of Curtilage (doc. no. 73), Ex. A ("Def. Ex. 73-A"); Opp. to Pennymon Mot. Suppr. (doc.

19    no. 97), Ex. A ("Gov't Ex. 97-A").

20    On January 21, 2013, OPD Officer Eric K. had just finished working the Warriors

21    game, and at around 5:00 or 6:00 pm that evening, Officer K. was asked to drive to 1759

22    Seminary Ave. to attempt to locate a vehicle that was used in a shooting the night before,

23    based on a tip from an informant that the getaway car from the shooting the day before

24    was located in the parking area.  Gov't Ex. 97-A at 3.  The vehicle was described as 2012

25    Dodge Avenger four-door white car with license plate 6VEP025.  Opp. to Mot. Suppr.

26    Arrest (doc. no. 99), Ex. A (Ellis Arrest Warrant Affidavit) ("Gov't Ex. 99-A").

27    Officer K. was acting in an undercover capacity, not driving a marked police car,

28    and he was not wearing a full police uniform, but he was wearing a sweatshirt and

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1   uniform pants.  Gov't Ex. 97-A at 39; Gov't Ex. 99-A.  Officer K. drove past the apartment

2   complex and made a U-Turn to confirm that it was 1759 Seminary.  Def. Ex. 73-A at 7.

3   Officer K. noticed a male black (whom he later identified as Pennymon) standing on the

4   southeast corner of the complex who seemed to lean forward to see who was making the

5   U-turn.  Def. Ex. 73-A at 8.  Officer K. circled around the block, and saw the drive-in gate

6   to the apartment complex was closed, and noticed a Lexus approach the gate, and a

7   passenger got out and manually opened the front gate.  Officer K. followed the Lexus into

8   the driveway, and reached the rear parking area of the complex.  *Id.* at 11-12.

9        Officer K. turned his car around in the parking area and saw the suspect vehicle

10  from the January 20 shooting parked in the rear of the apartment complex, based on the

11  description and license plate.  Officer K. drove back down the driveway of the apartment

12  building towards Seminary Ave., only to discover that the gate was closed across the

13  entrance of the driveway.  Officer K. intended to stop and exit his car, open the gate

14  manually, and drive out.  Def. Ex. 73-A at 14.

15       Officer K. saw three individuals walking down the driveway from the area of the

16  parking lot behind the apartment complex toward his car.  Gov't Ex. 97-A at 14.  The first

17  suspect (whom Officer K. identified as McDaniel) approached the front passenger door,

18  and he was wearing a multi-colored scarf over his head, black peacoat, black T-shirt and

19  dark baggie jeans.  Def. Ex. 73-A at 14-15.  A second suspect (identified as Kincaid)

20  walked along the driver's side door and stopped at the driver's side window, and "was

21  wearing a black hooded jacket that was open with a white T-shirt, baggie T-shirt, with

22  black imprints or designs on it and dark dark [sic] jeans."  *Id.* at 15.  A third suspect

23  (identified as Pennymon) walked to the driver's side door but stopped at the left rear

24  door.  Gov't Ex. 97-A at 16.  Pennymon was wearing a hoodie, but nothing was blocking

25  his face, eyes, nose, mouth or chin.  *Id.* at 22.

26       Officer K. was on the phone with Officer Miller when Kincaid knocked on the

27  window.  Def. Ex. 73-A at 17.  Officer K. lowered his window, Kincaid asked him "Who's

28  you," and Officer K. told him that he was "looking for a female."  *Id.* at 17.  During the

United States District Court
Northern District of California

initial contact when Kincaid asked Officer K. who is you, Pennymon said, "I seent [sic] you when you made that U-turn in front of the complex."  Gov't Ex. 97-A at 42.  The timing and course of the conversation is not clear, but Officer K. testified that after he said he was looking for a female, McDaniel asked for a name, so Officer K. came up with a name, Keisha, and McDaniel responded, "There ain't no Keisha here."  Def. Ex. 73-A at 17.  McDaniel and Kincaid inquired further and were looking inside the car, asking Officer K. who he was talking to on the phone; Officer K. said "at this point Pennymon had [sic] said anything."  *Id.* at 17-18.  Officer K. had not yet identified himself as a police officer during this questioning.

Officer K. noticed Kincaid and McDaniel looking inside the car, where Officer K. kept a compact Glock sitting on the center console, partially covered by a booklet but with the rear of the gun uncovered.  Def. Ex. 73-A at 20.  Officer K. testified that all three suspects brandished three firearms on him, with Kincaid and Pennymon at the driver's side window, no more than one foot away from Officer K., pointing their guns about 4 inches from Officer K.'s head.  Gov't Ex. 97-A at 22-23.  One firearm "was a dark colored semiautomatic pistol" and the second one was a "chrome and black" semiautomatic.  *Id.* at 23.  McDaniel was pointing his gun at Officer K. through the window.  *Id.* at 23.

Officer K. exited his car, and was kept in the V of the door.  *Id.* at 26.  He was "looking around the driveway, looking up, looking out windows, not only to see if anybody's out there, but also to look at additional possible threats besides the three that I have."  *Id.* at 26.  He was paying attention to the three individuals "[b]ecause I know at some point if I do recover from the incident, I would have to identify them."  *Id.* at 26.  He was looking at "height, weight, facial features, build, demeanor, firearms."  *Id.*

Officer K. carried a gun holstered on his duty belt, and Kincaid told Officer K. to "give it up" or hand over his gun.  *Id.* at 28.  McDaniel was unable to remove Officer K.'s holster or firearm from the holster, and wrestled with Officer K. for the gun.  First Kincaid pistol-whipped Officer K. in the head two or three times.  *Id.* at 28-29.  Then Pennymon

7

1   hit Officer K. on the left side of the head twice with the front side of Pennymon's gun. *Id.*

2   at 29.

3       McDaniel appeared to get frustrated because he wasn't able to remove Officer K.'s

4   gun from the holster, and pointed his firearm toward Officer K.'s forearm, and fired one

5   round. Officer K. was shot in his left wrist. At that point, Officer K. told them "I'm the

6   police"; "5-0"; I'm a cop." *Id.* at 39. Kincaid put his pistol on the bridge of Officer K.'s

7   nose and said "I don't care if you're the police." *Id.* Kincaid and Pennymon pistol-

8   whipped him again, about once or twice each, and then they fled. *Id.* at 41-42. McDaniel

9   tried to run off, but Officer K. struggled with him, and he slid out of his jacket and ran off

10  as Officer K. saw the first patrol unit arrive on scene. During the struggle, the suspects

11  allegedly took two pistols from Officer K.

12      As McDaniel fled, responding officers arrived and Officer K. was transported to the

13  hospital.

14      **2.      Photo Lineups**

15      At the hospital, Officer K. was treated for a gunshot wound to the left forearm and

16  three lacerations on the top left of his head, resulting in about 13 or 14 stitches. Gov't Ex.

17  97-A at 45. He was released by 1:00 am on January 22, 2013. Officer K. was given

18  morphine, then was visited by family at the hospital. He was fine until his baby sister

19  came in the room, at which point he became emotional. *Id.* at 46-47.

20      OPD Officers Basa, Milina, Sanchez and Nolan came to the hospital on January

21  21, 2013, while the family was visiting. After Officer K.'s sister arrived and after he was

22  given morphine, the officers showed Officer K. a photographic lineup at around 9:18 pm.

23  *Id.* at 47-48. The lineup included photos of Pennymon and five other men, and Officer K.

24  did not identify him as an assailant. Pennymon Mot. Suppr. (doc. no. 71), Ex. A ("Def.

25  Ex. 71-A"); Gov't Ex. 97-B.

26      Two days later, January 24, 2013, at the Criminal Investigation Division, police

27  showed Officer K. three more photo arrays. One array included Kincaid and five other

28  men. The second array included McDaniel and five other men. The third array included

8

1    J.B., who was then a suspect, and five other men.  None of those arrays shown on

2    January 24 included Pennymon's photograph.  Officer K. identified Kincaid and McDaniel,

3    and not J.B.  Opp. to Pennymon Mot. Suppr. (doc. no. 97), Ex. D (Brandwood Decl.).

4        On February 21, 2013, police showed Officer K. another six-pack photo lineup that

5    included Pennymon's most recent booking photograph.  Officer K. requested that black

6    hooded sweatshirts be added over the faces because the third assailant wore a hoodie

7    that covered his face throughout the duration of the shooting.  Pennymon Mot. Suppr.

8    (doc. no. 71) at 5.  Officer K. identified Pennymon, in position number 3, in the photo

9    array.  Gov't Ex. 97-A at 52.

10   **C. Search of Apartments**

11       The Incident Recall CAD provides the following timeline of the searches of the

12   apartments.  Opp. to Mot. Suppr. Apt. Search (doc. no. 95), Ex. A ("Gov't Ex. 95-A").

13   January 21, 2013

14   6:26 pm      Officer K. was shot. (Gov't Ex. 95-A at 3370.) Medical
15                personnel and police arrive within minutes. They secured a
16                perimeter, checked license plates within the perimeter, and
                  looked for witnesses. One suspect was described as "MB
17                drk complex 5'6 all blk clothing thin mustache"; and another
                  suspect described as "MB med blt, short hair, blk clothes."
                  (*Id.* at 3370 to 3376.)

18   8:32 pm      Search team had "info that susp[ects] might be involved w/
19                1759 Sem[inary]," with "search team moving in" at 8:34 pm.
                  SWAT team was due to "join shortly and brief on search
20                plan."  (*Id.* at 3376.)

21   9:26 pm      After some occupants of apartment 110 came out (20:50),
                  SWAT was sent in to clear it, given information that at least 2
22                subjects were still inside #110, and ordered 2 more
                  occupants to come out and took them in custody. (Gov't Ex.
23                95-A at 3376 to 3378.)

24   10:41 pm     Police were "holding perimeter on 1759 Sem" and continue
                  their search of nearby houses, roofs, yards, and a creek.
25                (Gov't Ex. 95-A at 3380)

26   11:55 pm     Officers announced they were "done w[ith] yard search" and
                  returned to "focus on 1759 Sem[inary]." (Gov't Ex. 95-A at
27                3382.)  Police ordered that the "perimeter will be broken
                  down shortly."  At that point, it was early morning of January
28                22, the police were changing shifts starting around 12:34
                  am, and police had not yet searched any apartments.

United States District Court
Northern District of California

January 22, 2013

| | | |
|---|---|---|
| 12:53 am | | SWAT re-entered 1759 Seminary. (Gov't Ex. 95-A at 3383.) |
| 1:05 am | | The warrant authorizing search of apartments 108, 110, and 212 was signed by Judge Horner. (Gov't Ex. 95-B (signed warrant).) |
| 1:17 am | | News of the signed warrant was broadcast over the police radio: "SW signed - good to go". (Gov't Ex. 95-A at 3384.) |
| 1:50 am | | SWAT began its entry with apartment 212. (Gov't Ex. 95-A at 3385.) First, loud speakers warned occupants to stay away from the windows. (*Id.*) Minutes later, officers fired bean bag rounds into the windows of apartment 212. (*Id.*) |
| 2:07 am | | The door to apartment 212 was breached. (Gov't Ex. 95-A at 3385.) A robot was dispatched into the unit to search for people. (*Id.*) The robot cleared the unit except for two closed doors. (*Id.*) A K-9 entered and found no one. (*Id.*) |
| 2:24 am | | Gas canisters were deployed through the front door – and from the rear yard. (Gov't Ex. 95-A at 3386.) |
| 2:36 am | | Apartment 212 was "clear[ed]" by 2:36 am. (*Id.* at 3385 to 3386.) |
| 3:14 am | | CID detectives were ordered to report to the bearcat (the SWAT utility vehicle) with gas masks, because they were "ab[ou]t to search 212." (*Id.* at 3388.) |
| 3:41 am | | The "search team [was] in [apartments] 108, 110, and 212." (*Id.* at 3388.) |

Pursuant to a search warrant, Oakland police conducted a search of 1759 Seminary Ave., Apartments 108, 110 and 212.  The search of Apartment 212 was conducted by OPD Officers Milina, Rosin, and Gonzales.  Gov't Ex. 95-C.  Among other things, Officer Milina found three pistols, including both handguns taken from Officer K.  Gov't Ex. 95-C.  Keys to the Dodge Avenger rental car were also found in the apartment. *Id.*  Cell phones and boxer shorts – which contained DNA consistent with defendant Ellis – were also recovered.

The search warrant affidavit by Officer Jason Anderson, which is subject to a sealing order, summarized the shooting of Officer K. and presented the following facts in support of the search warrant application to search Apartments 108, 110 and 212, as redacted by the government:

Officer S. Valle received information from a confidential reliable informant that will be referred to as X in this affidavit. X told Officer Valle the following information regarding to attempt murder of Officer [K.]. X advised Officer Valle that shortly after the shooting, X received a phone call [  ]. "Tay Tay" and "Lil' Dame" just shot someone in the driveway of the apartment complex. Officer Valle told your affiant that Officer Valle knows "Tay Tay" to be the street moniker for Deante Kincaid and "Lil' Dame" to be the street moniker for Damien McDaniel. [  ] "Lil' Joe" and "B.O.T." were also in the driveway when the shooting happened. Officer Valle told your affiant that Valle knows "B.O.T." to be Purvis Ellis.

Officer Valle later advised your affiant that X told Officer Valle that [  ]. X told Valle [  ] "Tay Tay" just shot at a cop [  ] "Lil' Joe" got away and fled the area after the shooting. Based on this conversation, Officer Valle told your affiant that Valle believes that Deante Kincaid put the gun that was taken from Officer [K.] and the gun that was possibly used to shoot him with inside Ellis' apartment.

Officer Valle advised your affiant that he has had several conversations with X regarding 1759 Seminary Avenue over the past few days. Valle advised that X has told him that "Tay Tay", "Lil' Dame", "B.O.T.", "Lil' Joe", and "Lil' Tay" [  ]. X advised Officer Valle that "Lil' Dame", "B.O.T.", and Lil' Joe" all live in 1759 Seminary Avenue.

Officer Valle also told your affiant that he had a conversation with X regarding the shooting in the 5900 block of Foothill Boulevard. Valle advised your affiant that X told him that prior to the shooting on Foothill Boulevard, [  ]. X told Valle that a few days before the shooting, [  ] "B.O.T." [  ] in a Dodge Avenger four-door [  ]. Officer Valle was aware that a four-door vehicle was used in the shooting in the 5900 block of Foothill Boulevard. [  ] the license plate to the Avenger [  ] was 6VEP025, which is the exact same vehicle license plate and description of the Dodge Avenger that was used in the shooting in the 5900 block of Foothill Boulevard.

Officer Valle told your affiant that several hours after Officer [K.] was shot, Valle met with X in regards to the shooting. Officer Valle told your affiant that Officer Valle showed X CRIMS booking photos of Deante Kincaid, Purvis Ellis, and Damien McDaniel. X positively identified Kincaid as "Tay Tay", Ellis as "B.O.T.", and McDaniel as "Lil' Dame". Officer Valle also became aware that a Joseph Pennymon was detained during the shooting investigation of Officer [K.]. Believing that Pennymon might be "Lil' Joe", Officer Valle showed X a CRIMS booking photo of him to X. X positively identified Pennymon as "Lil' Joe". [  ]

Officer Valle told your affiant that he also obtained a blueprint of 1759 Seminary Avenue from Lt. T. Jones [  ].

1   Mot. Suppr. Apt. Search (doc. no. 81), Ex. A ("Def. Ex. 81-A") (search warrant affidavit).

2   A separate search warrant was issued at 12:10 pm on January 22, 2013, to authorize the

3   search of Apartment 112.

4   **D. Ellis's Arrest**

5   Around 11:00 am on January 22, 2013, Ellis and several other individuals were

6   arrested by OPD Tactical Team in Apartment 112 at 1759 Seminary Ave.  Mot. Suppr.

7   Digital Devices (doc. no. 79), Ex. B (Officer Milina's report) ("Def. Ex. 79-B") at RD 00351.

8   Ellis was handcuffed and taken outside to a cage car.  He was searched, with his

9   belongings placed in a manila envelope, and placed in the rear of the police car driven by

10  Officers Seay and Cumby.  Def. Ex. 79-A.  "A moment later, Ofc. R. Johnson asked if

11  ELLIS was in possession of any mobile phones.  Ofc. Fesmire told Ofc. Johnson that

12  ELLIS did have a phone and that it was with his property and inside OPD Vehicle #1203.

13  Sgt. G. Porritt advised that he recovered a mobile phone from ELLIS's person when he

14  was detained."  *Id.* at RD-0088.

15  At 11:35 am, Ellis was brought to CID and Officer Gumby gave Officer Milina Ellis'

16  personal belongings, including an iPhone 5 and a ZTE model 910 cell phone.  Def. Ex.

17  79-B at RD-00351.

18  An arrest warrant was issued for Ellis on January 22, 2013, 12:20 pm.  Mot. Suppr.

19  Arrest (doc. no. 77), Ex. A ("Def. Ex. 77-A").  The supporting probable cause affidavit by

20  OPD Sergeant Nolan alleged the same background facts as the search warrant affidavit

21  and also stated what was found during the search of the apartments: the two Glock

22  handguns that were taken from Officer K. were recovered from Apartment 212, which

23  was attributed to Ellis.  The affiant stated that the recovery of the firearms combined with

24  the information from the confidential informant tended to indicate that Ellis had

25  involvement in the assault and attempted murder of Officer K.  Def. Ex. 77-B.  The affiant

26  also knew from past investigations that Ellis was associated with the extremely violent

27  Gas Team gang years ago, that his name has been associated with gangs known to

28  commit shootings with great regularity, and that search warrants have been served on

Ellis that yielded firearms in the past.  The affidavit also stated that in past investigations, Ellis was the target of wiretaps.

The Ellis arrest warrant affidavit referred to a prior conviction for possession of assault rifles:

> On 6Jun08, Oakland Police Lieutenant T. Jones executed a search warrant on a vehicle Purvis Ellis was believed to be storing weapons.  4 Assault Rifles were recovered from the trunk of the vehicle, 1995 Lexus SC 400 2D Green.  The vehicle was registered to Jabulani Williams who lived at 5944 Bromley #B.  The vehicle was parked in the 5900 block of Bromley.  Officers knew from the wiretaps that Ellis lived in the 5900 block of Bromley Street and he later admitted on the wiretaps that the rifles belonged to him.  Ellis was later convicted of possessing those Assault Rifles.  This case is documented on OPD RD# 08-055051.

Gov't Ex. 99-A.  The Oakland Police Department records show that on June 6, 2008, police officers contacted Ellis who was a possible suspect in a murder investigation, and arrested Ellis after conducting a pat down search for weapons and finding suspected rock cocaine and a large amount of cash.  Police searched Ellis' car and found a loaded 9mm handgun under the driver's seat where Ellis was sitting.  Police obtained a search warrant later that day to search Ellis' residence at 5931 Bromley Apt. A and a 1995 Lexus license 5BDY111.  Police recovered 3 assault rifles from the trunk of the Lexus, and a 9mm handgun and ammunition from the apartment.  Gov't Ex. 99-B (page 25 of 44).

Ellis points out that he was not convicted of possessing assault rifles.  Rather, as the government concedes, on October 14, 2009, Ellis entered a plea of no contest to possession for sale of cocaine base, in violation of § 11351.5 of Cal. Health & Safety Code, and a gun enhancement pursuant to Cal. Penal Code § 12022(c).  Def. Ex. 77-D; Gov't Ex. 99-B (page 32 of 44).  Ellis was sentenced to 8 years imprisonment.

### E.  Criminal Proceedings

Ellis was charged in state court with being a felon in possession of a firearm. Ellis's attorney in the state-court proceedings made repeated requests for the affidavit to the search warrant for Apartment 212.  Ellis's then-attorney filed a motion seeking the affidavits.  Not long after that motion was filed, and before the search warrant affidavits

were produced, the Alameda County District Attorney's office dismissed all charges against Ellis and he was released from custody.  In December 2013, Ellis and his three co-defendants were indicted in the present case by the federal government.

Defendants are charged as follows:

Count 1:    All defendants charged with Racketeering Conspiracy (18 U.S.C. 1962(d)) to conduct the affairs of the Sem City enterprise through a pattern of racketeering activity consisting of acts of murder; robbery; distribution and possession with intent to distribute controlled substances; sex trafficking of minors; enticement of minor to engage in prostitution; fraud in connection with identification documents; and fraud in connection with access devices.

Count 1 also gives notice of special sentencing factors: (1) conspiracy to commit murder of Victim 1 on January 20, 2013; and (2) attempted first degree murder of Victim 1.

Count 2:    All defendants charged with Attempted Murder in Aid of Racketeering (18 U.S.C. § 1959(a)(5) and 2) for the attempt to murder Victim 1 on January 20, 2013, for the purpose of gaining entrance to, maintaining and increasing position in Sem City.

Count 3:    All defendants charged with Assault with a Dangerous Weapon/Resulting in Serious Bodily Injury in Aid of Racketeering (18 U.S.C. § 1959(a)(3) and 2) for the January 20, 2013 assault on Victim 1 with a dangerous weapon, resulting in serious bodily injury, for the purpose of gaining entrance to, maintaining and increasing position in Sem City.

Count 4:    All defendants charged with Maiming in Aid of Racketeering (18 U.S.C. § 1959(a)(2) and 2) for maiming Victim 1 on January 20, 2013, for the purpose of gaining entrance to, maintaining and increasing position in Sem City.

Count 5:    All defendants charged with Use/Possession/Brandish/Discharge or Firearm in Furtherance of Crime of Violence (18 U.S.C. § 924(c)(1)(A) and 2)  for willfully and knowingly using and carrying and brandishing and discharging a firearm on January 20, 2013, during a crime of violence, i.e., attempted murder, assault with deadly weapon, and maiming in aid of racketeering.

Count 6:    Defendants Kincaid, McDaniel, and Pennymon charged with Assault with a Dangerous Weapon/Resulting in Serious Bodily Injury in Aid of Racketeering (18 U.S.C. § 1959(a)(3) and 2) for assaulting Victim 2 on January 21, 2013, for the purpose of gaining entrance to, maintaining and increasing position in Sem City.

Count 7:    Defendants Kincaid, McDaniel, and Pennymon charged with Use/Possession/Brandish/Discharge of Firearm in Furtherance of Crime of Violence (18 U.S.C. § 924(c)(1)(A) and 2)  for the assault on Victim 2 (as charged in Count 6).

United States District Court
Northern District of California

14

Count 8:   Defendant Kincaid charged as Felon in Possession of Firearm (18 U.S.C. § 922(g)(1)) for possession of 3 semiautomatic handguns on January 21, 2013.

Count 9:   Defendant McDaniel charged as Felon in Possession of Firearm (18 U.S.C. § 922(g)(1)) for possession of 3 semiautomatic handguns (2 of which are also charged as being in Kincaid's possession) on January 21, 2013.

## II.  Motions for Bill of Particulars

All defendants move for a bill of particulars:  Ellis filed a motion for a bill of particulars on his own behalf; McDaniel filed a motion for a bill of particulars on behalf of all defendants; and Kincaid filed a motion to dismiss, or, in the alternative, for a bill of particulars, on behalf of all defendants.  The government filed a consolidated opposition brief to address all three motions for bill of particulars.  Doc. no. 104.  Because the issues raised in the three motions overlap, the court addressed the motions collectively at the hearing and ruled on the motions as summarized below.

### A.  Racketeering Counts

1.   Defendants' motion for a bill of particulars to specify when each defendant joined the alleged conspiracy is DENIED.  Defendants are not entitled to a bill of particulars to seek "complete discovery of the government's evidence, which is not a purpose of the bill of particulars."  *United States v. Giese*, 597 F.2d 1170, 1181 (9th Cir. 1979).  With respect to the racketeering conspiracy charged in Count One, the indictment alleges that the racketeering conspiracy existed from "at least in or about 2007," through December 2013.  Indictment ¶ 9.  The Ninth Circuit has recognized that "uncertainty regarding a conspiracy's beginning and ending dates does not render an indictment fatally defective so long as overt acts alleged in the indictment adequately limit the time frame of the conspiracy."  *United States v. Forrester*, 616 F.3d 929, 941 (9th Cir. 2010). Unlike other cases prosecuted in this district alleging several different conspiracies and vague time frames, the indictment here specifies a beginning and end date for the alleged conspiracy, which spanned an 8-year period, and refers to racketeering activity for an alleged gang, Sem City, that occurred during that discrete time frame.  *Cf. United*

United States District Court
Northern District of California

*States v. Alvarez*, No. 14-CR-00120 EMC (NC), 2014 WL 7240670 (N.D. Cal. Dec. 19, 2014) (granting in part the defendants' motion for bill of particulars where the superseding indictment charged three different conspiracies, including "a conspiracy with a long and vague time period (since at least the early 1990s) and [ ] a conspiracy that involves members of two affiliated organizations"); *United States v. Cerna*, No. CR 08-0730 WHA, 2009 WL 2998929 (N.D. Cal. Sept. 16, 2009) (ordering the government to provide a bill of particulars clarifying when each defendant is alleged to have first joined each conspiracy, where the government charged 24 of the total 31 defendants with three separate conspiracy counts and the three conspiracies were alleged to have been in existence since "at least the late 1990s," when some defendants were just ten years old).  This information about the duration of the conspiracy is sufficient to apprise each defendant of the charges against him, enable him to prepare a defense, and to avoid double jeopardy on the same charge.

2.     Defendants' request for the names of alleged members, shooters, leaders, employees and associates of Sem City is DENIED.  The Ninth Circuit has expressly held that a bill of particulars is not required to identify some of the exact details sought by defendants, holding that a bill of particulars is not warranted to provide the following kinds of details: "(1) to obtain the names of any unknown coconspirators; (2) to determine the exact date on which the conspiracy allegedly began; and (3) to delineate all other overt acts that comprised the charged activity."  *United States v. DiCesare*, 765 F.2d 890, 897-98 (9th Cir. 1985) (citing *United States v. Long*, 449 F.2d 288, 294–95 (8th Cir. 1971) (exact times); *Wilkins v. United States*, 376 F.2d 552, 562–63 (5th Cir. 1967) (names of all coconspirators); *Cook v. United States*, 354 F.2d 529, 531 (9th Cir. 1965) (all overt acts)), *amended on other grounds*, 777 F.2d 543 (9th Cir. 1985).

3.     Ellis's motion for a bill of particulars to identify the "specific effect on interstate commerce of the alleged enterprise" is DENIED.  Ellis Mot. Bill Part. (doc. no. 83) at 1.  Ninth Circuit authority does not require that the indictment plead evidentiary detail such as how interstate commerce was interfered with, or the theory of interstate

16

United States District Court
Northern District of California

1    impact.  *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004) (citing *United*

2    *States v. Woodruff*, 50 F.3d 673, 676 (9th Cir. 1995)).  "In the Ninth Circuit '[t]he use of a

3    "bare bones" information—that is one employing the statutory language alone—is quite

4    common and entirely permissible so long as the statute sets forth fully, directly and

5    clearly all essential elements of the crime to be punished.'"  *Woodruff*, 50 F.3d at 676

6    (quoting *United States v. Crow*, 824 F.2d 761, 762 (9th Cir. 1987)).

7          4.      Defendants' motion for a bill of particulars is DENIED with respect to their

8    request for identifying information about the racketeering acts which comprised the

9    enterprise's pattern of racketeering activity, as alleged in Count One - Racketeering

10   Conspiracy.  The court determines that the indictment sets forth the elements of the

11   offenses and sufficiently alleges a violation of § 1962(d).  *See United States v. Martinez*,

12   657 F.3d 811, 816 (9th Cir. 2011) (to convict a defendant of RICO conspiracy under

13   § 1962(d), "the government's burden was only to show his assent to the conspiracy and

14   the acts furthering its end") (citing *Salinas v. United States*, 522 U.S. 52, 63–66 (1997));

15   *United States v. Fernandez*, 388 F.3d 1199, 1219-20 (9th Cir. 2004) ("an indictment

16   setting forth the elements of the offense is generally sufficient"), *modified*, 425 F.3d 1248

17   (9th Cir. 2005).  However, the government is ORDERED to make disclosures that it

18   agreed to provide, specifying the overt acts and the acts comprising the pattern of

19   racketeering activity alleged in Count One.  Accordingly, the government shall provide

20   details, including dates, whether charges were filed, and whether convictions were

21   entered, with respect to the racketeering activity alleged in ¶ 9 of Count One of the

22   indictment, as reiterated in ¶ 15 of Count Two: murder, robbery, distribution of controlled

23   substances, sex trafficking of minors, enticement of minor to engage in prostitution, and

24   fraud in connection with identification documents and with access devices.  The

25   government shall provide these disclosures within thirty days of the date of this order.

26         5.      Defendants' motion for a bill of particulars with respect to the alleged violent

27   crimes in aid of racketeering activity ("VICAR"), in violation of 18 U.S.C. § 1959, is

28   DENIED.  Here, the indictment expressly alleges the required elements for VICAR status

1   crimes and is therefore sufficient to permit defendants to prepare their defenses, avoid

2   surprise at trial, and protect against double jeopardy:

3        a. Count Two alleges that Sem City constituted an ongoing criminal

4        organization and racketeering enterprise engaged in racketeering activity,

5        and defendants Ellis, Kincaid, McDaniel and Pennymon attempted to

6        murder Victim 1 for the purpose of maintaining their position in Sem City.

7        b. Count Three alleges that, in aid of racketeering, all four

8        defendants assaulted Victim 1 with a dangerous weapon resulting in

9        serious bodily injury.

10       c. Count Four alleges that, in aid of racketeering, all four

11       defendants maimed Victim 1.

12       d. Count Six alleges that Kincaid, McDaniel and Pennymon

13       assaulted Victim 2 (Officer K.) with a dangerous weapon resulting in

14       serious bodily injury, in aid of racketeering.

15  *See Fernandez*, 388 F.3d at 1219-20 (citing *United States v. Bracy*, 67 F.3d 1421, 1429

16  (9th Cir. 1995); *United States v. Vasquez-Velasco,* 15 F.3d 833, 842 (9th Cir. 1994)).

17  The evidentiary details sought by defendants, such as "the basic who, what, when, where

18  and why of the crimes alleged," fall within the scope of discovery and do not warrant a bill

19  of particulars.  Full discovery "obviates the need for a bill of particulars."  *Giese*, 597 F.2d

20  at 1180.  To the extent that the § 1959 counts incorporate the allegations of overt acts

21  and racketeering activity in Count One, the government is ORDERED to disclose

22  specifying information about those acts, as it agreed to provide, within thirty days of the

23  date of this order.

24     **B. Coconspirator Statements**

25       Defendants' motions for a bill of particulars to specify when each defendant joined

26  Sem City, to allow the defense to determine whether coconspirator statements may be

27  admitted against them pursuant to FRE 801(d)(2)(E), is DENIED.  In advance of trial, the

28  court will issue its standard protocol requiring the government to provide notice of

United States District Court
Northern District of California

1   coconspirator statements to be introduced at trial.  The protocol will be similar, but not

2   necessarily identical, to the protocol established by the court in *United States v.*

3   *Zaragoza, et al.,* No. CR 08-83 PJH, doc. no. 576 (Amended Pretrial Order, July 29,

4   2010).  Given that a trial date has not yet been set, and discovery is ongoing, disclosure

5   of coconspirator statements is not required at this juncture.

6      **C.  Aiding and Abetting Allegations**

7          Defendants' motions for a bill of particulars to specify which defendants are

8   principals, and who are aiders and abettors, are DENIED.  The indictment may charge a

9   defendant with being both a principal and an aider and abettor.  *United States v.*

10  *Armstrong*, 909 F.2d 1238, 1241 (9th Cir. 1990) ("[a]iding and abetting is implied in every

11  federal indictment for a substantive offense") (citing *United States v. Gaskins*, 849 F.2d

12  454, 459 (9th Cir. 1988)).  *See* 18 U.S.C. § 2.  To address defendants' argument that the

13  lack of specifics fails to ensure that the crimes charged by the grand jury will be the same

14  specific crimes presented to the petit jury at trial, the court determines that the indictment

15  does not, on this record, present a risk that any defendant would be convicted of a crime

16  different than the ones charged by the grand jury.  *Cf. United States v. Solis*, 841 F.2d

17  307 (9th Cir. 1988) (reversing convictions for distribution of heroin because the trial court

18  improperly instructed on the term possession when neither defendant was charged with

19  possession).  Furthermore, the indictment does not raise a double jeopardy concern, as

20  the RICO count alleging a racketeering conspiracy under § 1962(d), is distinct from the

21  VICAR counts alleging status crimes for the purpose of maintaining and increasing

22  position in the Sem City racketeering enterprise.  *See United States v. Luong*, 393 F.3d

23  913, 916-17 (9th Cir. 2004) (the Double Jeopardy clause does not prohibit prosecution for

24  a RICO conspiracy and for the predicate (Hobbs Act) offenses that constituted a pattern

25  of racketeering activity, even when "the predicate offense is itself a conspiracy," because

26  "RICO criminalizes structural conduct that is separate and apart from predicate

27  offenses.").

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### D.  Special Sentencing Factors

Defendants' motion for a bill of particulars to provide notice of the government's theory of criminal liability, in order to prepare and defend against the special sentencing factors, is DENIED.  The government is not required to disclose its theory of liability as to each defendant in a bill of particulars, as long as full discovery is provided to the defense. *United States v. Buckner*, 610 F.2d 570, 574 (9th Cir. 1979) ("Assuming, as we do, that all relevant facts were disclosed and available, the government is not obliged to disclose the theory under which it will proceed.").

### E.  Section 924(c)(1) Counts

Defendants' motion for a bill of particulars to specify the firearm(s) charged in Counts Five and Seven, and to specify whether a firearm was used, brandished or discharged, and by whom, is DENIED.  The facts alleged in the indictment, including the specific incidents when the firearms were allegedly used in furtherance of a crime of violence, as well as the police reports related to each incident and the search returns specifying which guns were recovered, are sufficient to put defendants on notice of the charges against them.

### F.  Section 922(g)(1) Counts

Defendants' motion for a bill of particulars to specify the prior felony conviction that Kincaid and McDaniel suffered, as alleged in Counts Eight and Nine, is DENIED in light of the government's undisputed representation that it has provided discovery regarding defendants' prior criminal history, including their rap sheets.

## III.  Motions for Discovery and Disclosures

### A.  Motion for Disclosure of 404(b) Evidence and for Disclosure of Identity of Confidential Informant

At the hearing on defendants' motion to compel discovery, for disclosure whether the government will introduce evidence of Ellis's prior arrest or other acts pursuant to FRE 404(b), and for disclosure of the confidential informant's identity, the government gave notice that it would seek introduction of defendant Ellis's prior arrests pursuant to

United States District Court
Northern District of California

1    FRE 404(b) and on other grounds.  The government indicated that it will produce wiretap

2    evidence related to the June 2008 investigation of Ellis, which led to his arrest and a

3    conviction, after conducting confidentiality review.  As the court ordered at the hearing,

4    the government shall provide the wiretap evidence within thirty days, and all other

5    potential FRE 404(b) evidence related to Ellis's prior arrests and conviction, within sixty

6    days, of the hearing.

7        At the hearing, the court initially denied defendants' motion for disclosure of the

8    confidential informant's identity and the content of the CI's communications to law

9    enforcement.  However, upon further review of the record in light of the argument

10   presented by counsel, the court vacates that denial and reopens defendants' motion for

11   disclosure with respect to the identity and communications of the CI.  At the time that the

12   government submitted its ex parte application to seal the search warrant and arrest

13   warrant affidavits containing the communications of the CI in November 2014, the

14   request to seal was presented in the context of discovery and there was neither full

15   briefing nor a hearing on whether the sealing was intended to be permanent or on the

16   nature of the danger the informant would face should the informant's identity be

17   disclosed.  The court was requested and did review in camera the unredacted affidavits

18   to confirm that the proposed redactions were necessary to protect the identity of a

19   confidential informant and one or more victims.  The court concluded that the requested

20   redactions were necessary to prevent the disclosure of the informant's identity and

21   information that tended to reveal the informant's identity.  Doc. no. 62.

22       Now that the court understands the extent to which the government has relied on

23   the content of the CI's communications in opposition to several motions to suppress, and

24   defendants have articulated a need for disclosure of the content of the CI's

25   communications to challenge the probable cause affidavits, the court will reconsider

26   defendants' motion for disclosure.  The court is concerned with the lack of a record

27   addressing the advisability of continued nondisclosure and will reopen the briefing to give

28   the parties an opportunity to address the factors that the court must consider in

1  determining whether an informant's identity and/or communications should be disclosed,

2  such as (1) the degree of the informant's involvement in the criminal activity; (2) the

3  relationship between the defendant's asserted defense and the likely testimony of the

4  informant; and (3) the government's interest in nondisclosure.  *United States v. Gonzalo*

5  *Beltran*, 915 F.2d 487, 488-89 (9th Cir. 1990) (per curiam).

6       As ordered at the hearing, the government shall file a supplemental brief to state

7  its position on the record, with supporting legal authority and factual assertions, for

8  continuing to withhold the confidential informant's identity and/or communications in light

9  of the arguments made in the pending motions to suppress.  These issues are not fully

10 addressed by either party in the motions for disclosure.  The government is directed to

11 address the following issues in its supplemental brief:

- What is the factual basis for the government's concern for the confidential
  informant's safety if his/her identity or communications are disclosed?

- Did the confidential informant participate in any of the crimes charged?

- Will the confidential informant testify at trial as a percipient witness?

- Was the confidential informant a percipient witness?

- Does the confidential informant have knowledge of any exculpatory
  evidence?

- If the confidential informant is expected to testify at trial, is there
  impeachment material pertaining to the informant?

- Even if the confidential informant will not testify, will the government
  introduce at trial any evidence provided by the confidential informant in
  support of the probable cause affidavits?

- What is the legal authority for limiting defendants' ability to challenge the
  probable cause determination by withholding not only the confidential
  informant's identity, but also his/her communications with law enforcement?

27 The court is particularly concerned about the following issue:  even if the informant was

28 not a percipient witness to either of the shootings alleged in this case, it is important to

United States District Court
Northern District of California

1    know if the informant was a witness to any other wrongs, acts or crimes that comprise the

2    racketeering activity.  Because those wrongs, acts or crimes are not described in the

3    indictment or elsewhere, it is impossible to understand the informant's full role and to

4    balance the interests required under *Roviaro v. United States*, 353 U.S. 53, 59-61 (1957).

5    As directed at the hearing, the parties shall meet and confer on a briefing schedule, with

6    the government to file its supplemental brief on September 9 or September 16, 2015.

7    The parties shall contact the court's courtroom deputy to set the matter on the court's

8    calendar for further argument.

9         **B.  Motion for Search and Disclosure of Electronic Surveillance (doc. no. 89)**

10            Defendants' motion for an order compelling the government to search for and

11   disclose all information related to electronic surveillance of defendants or any evidence

12   obtained related to this case as a result of electronic surveillance is DENIED AS MOOT

13   in light of the government's disclosures.  The parties are ordered to meet and confer on

14   further discovery requests related to the disclosures about the use of electronic

15   surveillance.  The government shall complete production responsive to those requests

16   within sixty days of the hearing, unless the parties agree to a later deadline.

17   **IV. Motions to Suppress**

18        **A.  Eyewitness Identifications**

19            1.       As stated on the record, Pennymon's motion to suppress eyewitness

20   identifications is DENIED.  Doc. no. 71.  Having reviewed the photo arrays that included

21   Pennymon's photo, the court finds that all the individuals in the February 21 photo array

22   appear to be in the similar age group, and at least 4 of the 6 have a similar complexion.

23   The court concludes that Pennymon did not stand out among the other individuals in the

24   photo array and that the identification procedure was not impermissibly suggestive.  In

25   particular, the court finds that the fact that hoods were added to all the photos in the

26   second photo array made the identification procedure more reliable, not suggestive.  The

27   officer's inability to identify Pennymon from the first photo array on the night of the

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   shooting was reasonable under the circumstances, including morphine treatment the

2   officer was receiving, and does not render the later identification unreliable.

3         Even if the second photo array was somehow suggestive, the court determines

4   that the identification was nonetheless reliable under the factors set forth in *Neil v.*

5   *Biggers*, 409 U.S. 188, 201 (1972).  *See also United States v. Love*, 746 F.2d 477, 478

6   (9th Cir. 1984).  The record shows that Officer K. had close, albeit brief, contact with

7   Pennymon and provided details about his appearance.  More importantly, Officer K.

8   demonstrated a high degree of attention and was specially trained to observe details.

9   Under the totality of the circumstances, the court finds sufficient indicia of reliability to

10  determine that there was no substantial likelihood of misidentification.

11        2.      Ellis's motion to suppress pretrial and in-court identifications remains

12  pending.  Doc. no. 82.  The government is ordered to produce transcripts of the audio

13  recordings of the photo and video lineups within thirty days of the hearing.  When the

14  transcripts are available, the government shall promptly file a supplemental affidavit

15  submitting those transcripts on the record and may file a surreply limited to the issues

16  raised by the newly produced transcripts.  Within seven days of the government's filing,

17  Ellis may file a response to the surreply.  The matter will be taken under submission

18  thereafter.

19  **B.  Motion to Suppress Evidence Seized from Illegal Search Conducted on**

20        **Residential Curtilage**

21        **1.      No Fourth Amendment Violation**

22        Defendants' motion to suppress all evidence seized from an illegal search

23  conducted on residential curtilage is DENIED.  Doc. no. 73.  Defendants contend that

24  Officer K. trespassed by entering uninvited onto the apartment driveway and parking lot,

25  which they contend lie within the curtilage of the apartment building, in violation of the

26  Fourth Amendment under the trespass test as set forth in *United States v. Jones*, 132

27  S. Ct. 945, 954 (2012).  Proceeding under the trespass theory, rather than the

28  reasonable expectation of privacy theory, defendants have not demonstrated that they

have a possessory interest in the driveway or parking lot to establish standing to assert a Fourth Amendment violation. *See Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978) ("the proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). To establish a property right in the common areas of the apartment complex, defendants must show that they have the right to exclude others. *Id.* at 144 n.12 ("One of the main rights attaching to property is the right to exclude others, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.") (citation omitted).

Although there is no Ninth Circuit authority post-*Jones* addressing an apartment tenant's right to exclude law enforcement and other non-tenants from common areas under the trespassory test, the Ninth Circuit has expressly held that "an apartment dweller has no reasonable expectation of privacy in the common areas of the building whether the officer trespasses or not." *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993) (citations omitted). The Ninth Circuit expressly rejected the minority view held by *United States v. Carriger*, 541 F.2d 545, 549 (6th Cir. 1976), on which defendants rely. *Nohara*, 3 F.3d at 1242. *See also United States v. Roberts*, 747 F.2d 537, 542 (9th Cir. 1984) (a homeowner had no reasonable expectation of privacy in a shared unobstructed private road because he "had no control over the five other homeowners: they could have invited anyone, including police officers, to drive up the road").

Defendants cite authority under state and local civil law in support of their argument that tenants have a possessory interest in common areas of an apartment building. However, the state court decisions cited by defendants do not extend a tenant's right to exclude others to encompass common areas beyond their own leased apartment or residence. *See Friends of the Trails v. Blasius*, 78 Cal. App. 4th 810, 830 (2000) (affirming judgment against irrigation district and landowners establishing public easement for recreational trail on portion of irrigation district's canal easement, and distinguishing authority recognizing that a landlord has no cause of action to prevent a

trespass because "under the law of landlord tenant relations, the landlord surrenders possession, 'that stick in the bundle of rights" which is critical'") (quoting *Dieterich Int'l. Truck Sales, Inc. v. J. S. & J. Serv. Inc.*, 3 Cal. App. 4th 1601, 1610 (1992) (holding that a landlord, who does not have a present possessory interest, has no cause of action for trespass to prevent a prescriptive easement across a portion of the landlord's property, and that a prescriptive easement could not ripen against the landlord's future reversionary interest)); *Allred v. Harris*, 14 Cal. App. 4th 1386, 1390 and n.3 (1993) (recognizing that "[a]s a general rule, landowners and tenants have a right to exclude persons from trespassing on private property; the right to exclude persons is a fundamental aspect of private property ownership," and finding that the tenant "had a possessory interest in the parking lot and walkways, had the landlord's specific authorization to take steps necessary for the security of the parking areas and was affected by the defendants' activities which were aimed at disrupting his normal business activities") (citation omitted); *Smith v. Cap Concrete, Inc.*, 133 Cal. App. 3d 769, 774 (Cal. Ct. App. 1982) (recognizing that "[t]he proper plaintiff in an action for trespass to real property is the person in actual possession; no averment or showing of title is necessary," and that an out-of-possession property owner may recover for an injury to the land in an action for waste). Here, unlike the tenant of the medical center in *Allred* that was held to have standing to seek an injunction against anti-abortion picketing, defendants have not shown that they were authorized by the landlord to provide security for the apartment driveway and parking lot to establish their right to exclude others. *See Allred*, 14 Cal. App. 4th at 1388.

In support of their argument that, under California law, tenants of an apartment complex have possessory interests in common areas, defendants cite a city ordinance defining a "Rental Unit" as "any unit in any real property . . . including the land appurtenant thereto, that is rented or available for rent for residential use or occupancy . . . together with all housing services connected with use or occupancy of such property, such as common areas and recreational facilities held out for use by the tenant."  Reply

(doc. no. 116) at 4 (citing Oakland Municipal Code, Code of Ordinances, Section

8.22.340 (Ord. 12537 § 1 (part), 2003)[1]).  This ordinance does not establish a tenant's

right to exclude others, including law enforcement officers, from the common areas

shared by all tenants, and defendants cite no authority under California law recognizing

such a right.  Rather, state courts have expressly rejected the argument that warrantless

entry into apartment hallways and other common areas is unconstitutional.  In *People v.

Seals*, 263 Cal. App. 2d 575 (1968), the court of appeal recognized that "police officers in

performance of their duty may, without doing violence to the Constitution, enter upon the

common hallway of an apartment building without warrant or express permission to so

do."  *Id.* at 577-78 (citing, inter alia, *Polk v. United States*, 314 F.2d 837, 838 (9th Cir.

1963) (per curiam) (search and seizure were not unconstitutional where police

approached rear door of the defendant's flat by "proceeding through a passageway,

pushing past a gate having no latch and standing ajar, and climbing an outside staircase,

all of which were for the joint use of the residents of both flats in the house, and which, to

all appearances, were open for the use of tradesmen and other persons having legitimate

business with any of the residents")).  Notably, *Seals* applied the traditional property-

based Fourth Amendment test for unreasonable searches and seizures, under which

defendants proceed, rather than the *Katz* privacy-based test.  The court held that even

assuming arguendo that the police were trespassers, "it has been repeatedly held that

the Fourth Amendment forbids unreasonable searches, not trespasses, and that a simple

trespass without more will not invalidate a subsequent search or seizure."  *Seals*, 263

Cal. App. 2d at 579 (citing *Teasley v. United States*, 292 F.2d 460, 464 (9th Cir. 1961);

*Giacona v. United States*, 257 F.2d 450 (5th Cir. 1958)).

     Similarly, in *People v. Howard*, 63 Cal. App. 3d 249, 254-55 (1976), the court held

that even when officers enter the common area through a locked outside door, where the

---

[1]     Available at
https://www.municode.com/library/ca/oakland/codes/code_of_ordinances?nodeId=TIT8H
ESA_CH8.22REREADEV (last visited Aug. 14, 2015).

manager gave the key to the police, there is no trespass in violation of the Sixth Amendment guarantee against unreasonable search and seizure, stating that a locked outside door does not establish the same sanctity for a common hallway as is established for the individual apartment.  The court in *Howard* implied that an individual tenant does not have the right to exclude others from the shared common areas of the apartment building: "Appellant cannot presume to control the right of other tenants, or particularly the manager as the owner's agent, to authorize entry to the building's common areas by non-tenants."  63 Cal. App. 3d at 254.  *See also People v. Terry*, 70 Cal. 2d 410, 427 (1969) ("Police officers in the performance of their duties may, without violating the Constitution, peaceably enter upon the common hallway of an apartment building without a warrant or express permission to do so.").  In light of this authority, defendants fail to show that state law recognizes a tenant's right to exclude others from common areas of an apartment building.

As defendants conceded during oral argument, a shared driveway to an apartment building or a shared parking lot is not protected as curtilage under established authority. Defendants cite no authority extending Fourth Amendment protection to the shared driveway or parking lot of an apartment complex.  To support their argument that Officer K.'s entry into the driveway and parking lot was a trespassory search, defendants cite state court authority recognizing the right of private parking lot owners and building tenants to prohibit trespass or pursue prosecution for trespass.  However, these authorities do not address tenants' possessory rights in, or their right to exclude others from, a common driveway or shared parking lot such as the common areas at issue here, particularly where the tenants have not shown that they were authorized to restrict entry to the shared parking lot or use of the parking spaces.  *See Planned Parenthood v. Wilson*, 234 Cal. App. 3d 1662, 1671 (1991) (rejecting a First Amendment challenge to Planned Parenthood's injunction restricting anti-abortion demonstrators from blocking a parking lot to a privately owned and operated medical plaza which lacked attributes of a public forum, where the medical center owner instructed Planned Parenthood to post "No

United States District Court
Northern District of California

1   Trespassing" signs throughout the parking lot and each parking space within the lot was

2   specifically designated for either patients or employees of tenants only); *In re Ball*, 23

3   Cal. App. 3d 380, 386 (Cal. Ct. App. 1972) (upholding conviction of antipollution

4   demonstrator in Disneyland parking lot for violating penal statute prohibiting intentional

5   interference with lawful business of a business establishment open to the public and

6   refusing to leave); *Kirkpatrick v. Damianakes*, 15 Cal. App. 2d 446, 449 (1936) (reversing

7   a judgment of damages for personal injuries sustained in a car accident where the

8   plaintiff who inadvertently drove into a private alley was a trespasser, because "[s]he was

9   not in the performance of any duty to the owner or tenants nor was she upon any

10  business with the owner or tenants").

11          Even if defendants had standing to raise a Fourth Amendment challenge and

12  Officer K.'s entry into the driveway and parking lot constituted a trespass, the Fourth

13  Amendment does not protect against mere technical trespass.  As Justice Scalia, writing

14  for the majority of the Court in *Jones*, noted, "our theory is *not* that the Fourth

15  Amendment is concerned with '*any* technical trespass that led to the gathering of

16  evidence.'  The Fourth Amendment protects against trespassory searches only with

17  regard to those items ('persons, houses, papers, and effects') that it enumerates."  *Jones*,

18  132 S. Ct. at 953 n.8 (citing *Jones*, 132 S. Ct. at 958 (Alito, J., concurring)).  In a

19  concurring opinion, Justice Alito anticipated, and rebutted, the argument raised by

20  defendants here, that reviving the trespassory test "based on 18th-century tort law" would

21  extend Fourth Amendment protections to any technical trespass on private property:

22          The Court's theory seems to be that the concept of a search, as originally
            understood, comprehended any technical trespass that led to the
23          gathering of evidence, but we know that this is incorrect.  At common law,
            any unauthorized intrusion on private property was actionable, see
24          Prosser & Keeton 75, but a trespass on open fields, as opposed to the
            'curtilage' of a home, does not fall within the scope of the Fourth
25          Amendment because private property outside the curtilage is not part of a
            'hous[e]' within the meaning of the Fourth Amendment.
26

27  *Jones*, 132 S. Ct. at 958 (Alito, J., concurring) (citing *Oliver v. United States*, 466 U.S.

28  170 (1984); *Hester v. United States*, 265 U.S. 57 (1924)).  To address Justice Alito's

1    concerns that a trespass-based test could be construed to extend Fourth Amendment

2    protection to a technical trespass under common law, Justice Scalia distinguished the

3    use of a GPS tracking device installed on the undercarriage of a vehicle, held to be

4    unconstitutional in *Jones,* from the trespass that occurred in *Oliver,* where the Court held

5    that "officers' information-gathering intrusion on an 'open field' did not constitute a Fourth

6    Amendment search, even though it was a trespass at common law." *Jones*, 132 S. Ct. at

7    953.  Justice Scalia noted that an open field, "unlike the curtilage of a home, [ ] is not one

8    of those protected areas enumerated in the Fourth Amendment," and that trespass onto a

9    privately owned open field "may properly be understood as a 'search,' but not one 'in the

10   constitutional sense.'"  *Id.* at 953 and n.8 (citing *Oliver,* 466 U.S., at 170, 183; *United*

11   *States v. Dunn*, 480 U.S. 294, 300 (1987)).  *See Florida v. Jardines*, 133 S. Ct. 1409,

12   1414 (2013) ("When 'the Government obtains information by physically intruding' on

13   persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth

14   Amendment' has 'undoubtedly occurred.'") (quoting *Jones*, 132 S. Ct. at 950-51 n. 3).

15        In light of this authority recognizing that the Fourth Amendment has been

16   traditionally understood "to embody a particular concern for government trespass upon

17   the areas ('persons, houses, papers, and effects') it enumerates," *Jones*, 132 S. Ct. at

18   950, and in the absence of authority recognizing the driveway or parking lot of an

19   apartment complex to be protected curtilage or other constitutionally protected area, the

20   officer's physical intrusion into the driveway or parking lot at 1759 Seminary Avenue did

21   not constitute a Fourth Amendment violation.  The motion to suppress Officer K.'s

22   observation of the suspected getaway car and license plate number, as evidence seized

23   from an illegal search conducted on residential curtilage, is therefore DENIED.

24        **2.     Independent Source Doctrine**

25        Alternatively, the motion to suppress is DENIED on the separate ground that law

26   enforcement's discovery of the getaway car's presence in the parking lot was

27   independent of Officer K.'s observation of the getaway car, when police responded to the

28   shooting of Officer K. in the driveway.  *See Nix v. Williams*, 467 U.S. 431, 443 (1984)

United States District Court
Northern District of California

("The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation."). The government has sufficiently distinguished the initial search from the subsequent shooting to support an exception to the exclusionary rule under the independent source doctrine. Once Officer K. was shot, the responding officers secured a perimeter around the apartment complex and began looking for suspects. The government has shown that investigation of Officer K.'s shooting was an independent source of the discovery of the getaway vehicle in the parking lot, as well as any evidence discovered in the search of the apartments. The record shows that the police arrived at the parking lot in response to the officer shooting, and there is no reason to infer that the police arrived in response to Officer K.'s observation of the getaway vehicle. Furthermore, based on information related to Officer K.'s shooting, as well as the responding officer's observation of the getaway car, the police obtained search warrants to search the car and several apartment units. Thus, the court concludes that the search of the apartments was conducted as a direct result of the assault on Officer K., which was "wholly independent" of Officer K.'s initial observation of the getaway vehicle.

The court will address defendants' challenges to the search warrants in a separate order ruling on the pending motions to suppress.

**V.  CONCLUSION**

Having ruled on the motions for a bill of particulars; the motion for discovery and disclosure of Rule 404(b) evidence; the motion for search and disclosure of electronic surveillance; the motion to suppress eyewitness identifications filed by Pennymon; and the motion to suppress evidence seized from illegal search conducted on residential curtilage, the court will rule on the motions that remain pending as follows:

(1) Upon submission of supplemental briefs and further oral argument on defendants' motion for disclosure of the confidential informant, whose communications to law enforcement were relied upon in the search warrant and arrest warrant affidavits, the court will be prepared to rule on the motions to

United States District Court
Northern District of California

suppress evidence seized during the search of Apartment 212, evidence seized pursuant to Ellis's arrest, and evidence seized from digital devices.

(2) Upon submission of supplemental materials related to the transcripts of audio recordings of the photo and video lineups, the motion to suppress pretrial and in-court identifications, filed by Ellis, will be taken under submission without further argument.

(3) Upon ruling on defendants' request for an evidentiary hearing, the court will rule on the pending application for issuance of a Rule 17(c) subpoena.

**IT IS SO ORDERED.**

Dated: August 17, 2015

_____
PHYLLIS J. HAMILTON
United States District Judge