UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

v.

PURVIS LAMAR ELLIS, et al.,

Defendants.

Case No.  13-CR-00818 PJH

**PRETRIAL ORDER NO. 3 DENYING MOTIONS TO SUPPRESS**

Doc. nos. 304, 307

On August 2, 2017, the court held a hearing on the motions of defendant Purvis Lamar Ellis to suppress evidence obtained from use of Stingrays on behalf of all defendants; to suppress evidence seized from Apartment 212 on behalf of all defendants; and to sever.  The court DENIED Ellis's motion to sever for the reasons stated on the record.  Doc. no. 306.  Having considered the relevant legal authority, the papers, argument of counsel, and the evidence in the record, the court DENIES the motions to suppress, doc. nos. 304, 307, for the reasons stated at the hearing and set forth below.

I.      **Motion to Suppress Evidence Obtained from Use of Cell Site Simulators**

Ellis moves on behalf of all defendants to suppress any and all evidence obtained or derived from the use of cell site simulators ("CSS"), generally referred to as Stingrays.  Doc. no. 304.  As described in the Department of Justice Policy Guidance ("DOJ Policy") cited by Ellis, a CSS functions by transmitting as a cell tower, such that cell phones in its proximity transmit signals to the CSS, which the cell phones identify as the most attractive cell tower in the area.  Doc. no. 304 at 3-5 (citing *United States v. Patrick,* 842 F.3d 540, 542–43 (7th Cir. 2016) (quoting DOJ Policy, Sept. 3, 2015), *reh'g and reh'g en banc denied* (May 9, 2017)).  "When used to locate a known cellular device, a cell-site

United States District Court
Northern District of California

1    simulator initially receives the unique identifying number from multiple devices in the

2    vicinity of the simulator.  Once the cell-site simulator identifies the specific cellular device

3    for which it is looking, it will obtain the signaling information relating only to that particular

4    phone."  *Id.* (internal marks omitted).  *See also* doc. no. 321, Ex. G ¶ 6 and Ex. I ¶ 6.

5        As supported by the record, Ellis has shown that the Oakland Police Department

6    ("OPD") and the Federal Bureau of Investigation ("FBI") each used a Stingray to locate

7    Ellis's cell phone starting in the early morning hours of January 22, 2013, following the

8    shooting of an OPD officer the evening of January 21, 2013.  Ellis contends that the use

9    of these Stingrays amounted to a warrantless search requiring suppression of any

10   evidence obtained or derived from the Stingrays, and/or an evidentiary hearing.  Ellis

11   further contends that the use of the Stingrays likely intercepted communications in

12   violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

13       **A.    Fourth Amendment Search**

14           **1.    Legal Standard**

15       The Fourth Amendment provides in relevant part that "[t]he right of the people to

16   be secure in their persons, houses, papers, and effects, against unreasonable searches

17   and seizures, shall not be violated."  *United States v. Jones*, 565 U.S. 400, 404 (2012).

18   The proponent of a motion to suppress has the burden of establishing that his own Fourth

19   Amendment rights were violated by the challenged search or seizure.  *Simmons v. United*

20   *States*, 390 U.S. 377, 389-390 (1968).

21       The Supreme Court recognizes two tests to determine whether a "search" within

22   the meaning of the Fourth Amendment occurred.  *Jones*, 565 U.S. at 411.  The first is the

23   "classic" common-law trespass test, as applied by the Court in *Jones.*  565 U.S. at 404-

24   05.  Under that property-based approach, government actions amount to a search when

25   "[they] physically occupy private property for the purpose of obtaining information" without

26   consent.  *Id.*  The Court explained that before Justice Harlan's concurrence in *Katz*

27   articulated the "reasonable expectation of privacy" standard, "for most of our history the

28   Fourth Amendment was understood to embody a particular concern for government

2

trespass upon the areas ("persons, houses, papers, and effects") it enumerates." *Jones*, 565 U.S. at 406.  The Court in *Jones* held that attachment of a Global Positioning System (GPS) tracking device to a vehicle, and the subsequent use of that device to monitor the vehicle's movements on public streets, was a search within the meaning of the Fourth Amendment, reasoning that "[t]he Government physically occupied private property for the purpose of obtaining information.  We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."  *Id.* at 404-05 (citation omitted).

Second, under the reasonable expectation of privacy test, the Fourth Amendment protects against an unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable.  *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  Under *Katz*, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place, but whether the person asserting the claim has a legitimate expectation of privacy.  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (citing *Katz,* 389 U.S. at 353).

## 2.    Use of Stingray Constitutes a Search

Ellis asserts several grounds for determining that the use of the Stingray to locate his cell phone in real time amounted to a Fourth Amendment search requiring issuance of a warrant: that the Stingray intruded into the constitutionally protected area of a private residence and that the Stingray violated Ellis's privacy interests both in the use and location of his cell phone and in his public movements.

In his reply, Ellis raises the argument that the government is bound by its concession in other cases that the use of a Stingray amounts to a search.  Doc. no. 324 at 2-3.  However, the court finds that these concessions were limited for the purposes of each particular case, and do not amount to a binding admission by the government.  *See Patrick,* 842 F.3d at 544, 545  (where the government conceded that use of a cell site simulator is a search for purposes of that litigation, the court noted that questions about

1  whether use of a simulator amounts to a search "have yet to be addressed by any United

2  States court of appeals," reserving the issue).

3                              **a.     Standing**

4           As a threshold matter, the government contends that only Ellis has standing to

5  challenge the use of a Stingray to locate his cell phone, and that no other defendant has

6  standing to bring a motion to suppress.  To the extent that Ellis challenges the potential

7  collection of signals from phones used by non-parties, the government correctly points

8  out that Ellis lacks standing to invoke the privacy rights of anyone else whose cell phone

9  may have been located by the Stingrays.  In light of the record showing that two

10  Stingrays were used to locate Ellis's cell phone, and no other defendant's cell phone,

11  Ellis alone has standing to bring the instant motion to suppress evidence obtained

12  through use of Stingrays.  *See Rakas*, 439 U.S. at 133-34 ("Fourth Amendment rights are

13  personal rights which, like some other constitutional rights, may not be vicariously

14  asserted.") (citation and marks omitted).

15                  **b.     Intrusion on Private Residence**

16          Starting with the *Jones* trespassory approach, Ellis argues that the government's

17  use of the Stingrays to monitor and track his phone was a search under the Fourth

18  Amendment because the Stingrays emitted signals that penetrated the walls of private

19  dwellings that were not open to visual surveillance.  Doc. no. 304 at 15 (citing *United*

20  *States v. Karo*, 468 U.S. 705, 714 (1984) and *Kyllo v. United States*, 533 U.S. 27, 29

21  (2001)).  In *Karo*, the Court held that the warrantless "monitoring of a beeper in a private

22  residence, a location not open to visual surveillance, violates the Fourth Amendment

23  rights of those who have a justifiable interest in the privacy of the residence."  In *Kyllo*,

24  the Court held that use of a thermal-imaging device aimed at a private home from a

25  public street to detect relative amounts of heat within the home constitutes a "search"

26  within the meaning of the Fourth Amendment, reasoning that "obtaining by sense-

27  enhancing technology any information regarding the interior of the home that could not

28  otherwise have been obtained without physical 'intrusion into a constitutionally protected

United States District Court
Northern District of California

4

area' [ ] constitutes a search—at least where (as here) the technology in question is not in general public use."  533 U.S. at 34 (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)).  Ellis argues that because a Stingray emits signals that penetrate the walls of constitutionally protected spaces, it amounts to trespass and constitutes a search under *Silverman,* 365 U.S. at 511-12 (holding that attaching a spike mike to a heating duct of a home was a search, reasoning that technical trespass is not necessary for Fourth Amendment violation but "actual intrusion into a constitutionally protected area" is sufficient) and *Jones*, 565 U.S. at 410 (holding that warrantless installation of GPS device to vehicle encroached on a protected area in violation of Fourth Amendment).

The government responds that Ellis lacks standing to assert any protected interest in the apartment where he was located because he was in someone else's home when the Stingray located his cell phone, not his own residence which was known to be Apartment 212.  Opp. at 6.  If Ellis had been in someone else's private residence at the time his cell phone was located by the Stingray, he could not strictly assert a violation of any property-based or privacy-related interest in that residence.  *See Kyllo*, 533 U.S. at 34-35 and *Karo*, 468 U.S. at 714.

Ellis argues that there is no evidence in the record to support the government's position that Ellis was not in his own home when his cell phone location was detected at a specific apartment.  The record indicates that Ellis and other occupants of Apartment 112 were escorted out of the building at around 10:52 am, but it is not clear from the record where Ellis was located when the Stingray tracked his cell phone location.  The evidence in the record only suggests that the Stingray, in conjunction with "a cell site simulator augmentation device," located Ellis's cell phone at a particular location that is not identified in the declarations.  *See* doc. no. 321, Ex. I (declaration of unnamed FBI Special Agent whose identifying information was redacted to protect his identity, see doc. no. 244 (8/8/16 transcript) at 15-16; previously submitted in this case as doc. no. 225-1).

The record is therefore insufficient to determine whether Ellis had any protectable interest in the residence where his cell phone was located.  It is unnecessary to decide

1    this issue of Ellis's standing to claim Fourth Amendment protection for the private

2    residence, however, because Ellis does have standing to challenge the use of the

3    Stingray to locate his cell phone based on a reasonable expectation of privacy in one's

4    real-time cell phone location, as discussed below.

5                    c.        **Reasonable Expectation of Privacy in Real-Time Location**

6                              **of Cell Phones**

7          Under the *Katz* test, Ellis has demonstrated that the use of the Stingray devices

8    amounted to a search in violation of a reasonable expectation of privacy in the real-time

9    location of his cell phone.

10         The Ninth Circuit has not decided the question presented here whether use of cell

11   site simulators to locate cell phones in real time amounts to a search, nor the issue

12   whether there is a reasonable expectation of privacy in one's cell phone location.  In

13   *Patrick,* the first circuit court opinion to address the use of Stingrays, the Seventh Circuit

14   noted that the issue remains unsettled as to whether the use of cell site simulators

15   amounts to a search, by analogy to GPS locators which are treated as searches when

16   police enter private property to install them under *Jones,* and which may impinge on

17   expectations of privacy when used for long-term monitoring.  *Patrick*, 842 F.3d at 543-44

18   (citing *Jones*, 565 U.S. at 413-31 (concurring opinions of Sotomayor and Alito, JJ.)).  The

19   court in *Patrick* also discussed the competing view that the use of cell site simulators is

20   more like the use of a pen register, which is not a search because it reveals the making

21   of a call and the number called but not the call's communicative content, or the use of a

22   beeper, which is not a search because it reveals a suspect's location but nothing else.

23   *Id.* (citing *Smith v. Maryland*, 442 U.S. 735 (1979), and *United States v. Knotts*, 460 U.S.

24   276 (1983)).  *Patrick* did not, however, decide this question because the government

25   "conceded for the purpose of this litigation that use of a cell-site simulator is a search."

26   *Id.* at 544.

27         In the absence of controlling authority, Ellis suggests that *Riley v. California*, 134

28   S. Ct. 2473, 2489-90 (2014), should be extended to recognize a protected privacy

United States District Court
Northern District of California

interest in the use and location of cell phones.  The Court in *Riley* held that a warrant is generally required to search the information on a cell phone, recognizing the privacy interests in the kinds of data stored on or accessed through modern cell phones, but did not go so far as to hold that the Fourth Amendment protects the use or location of a cell phone in real time.

> The storage capacity of cell phones has several interrelated consequences for privacy.  First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record.  Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible.  The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet.  Third, the data on a phone can date back to the purchase of the phone, or even earlier.  A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.
>
> Finally, there is an element of pervasiveness that characterizes cell phones but not physical records. . . . According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower. . . . [I]t is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate. . . .
>
> Although the data stored on a cell phone is distinguished from physical records by quantity alone, certain types of data are also qualitatively different. . . . Data on a cell phone can also reveal where a person has been. . . .

*Riley*, 134 S. Ct. at 2489–90 (footnote and citations omitted).  Though this discussion is instructive, *Riley* did not recognize a protected privacy interest in one's cell phone use or location.

On a related issue, several judges in this district have recognized a right to privacy in historical cell site location information ("CSLI") that is collected by cellular service providers.  CSLI is generated by the radio signals emanated by a cell phone to the closest cell tower in the cellular service network, as described more fully by Judge Koh in

7

1   *In re Application for Telephone Information Needed for a Criminal Investigation,* 119 F.

2   Supp. 3d 1011, 1013-15 (N.D. Cal. 2015), No. 15-xr-90304 HRL (LHK), doc. no. 30,

3   *appeal dismissed* (Feb. 5, 2016).  "The resulting CSLI includes the precise location of the

4   cell tower and cell site serving the subject cell phone during each voice call, text

5   message or data connection," and may be generated even without the user's interaction

6   with the cell phone.  *Id.* at 1014 (citations omitted).

7        Judge Illston addressed the privacy interests in such information in *United States*

8   *v. Cooper,* 2015 WL 881578 (N.D. Cal., Mar. 2, 2015), No. 13-cr-693 SI, doc. no. 117.

9   There, the defendant moved to suppress evidence obtained from collecting historical and

10  prospective, or real-time, cell site location information without a warrant.  Judge Illston

11  recognized that cell phone users have a reasonable expectation of privacy in their

12  physical location as conveyed by historical CSLI that is protected by the Fourth

13  Amendment.  *Id.* at *6-11 (citing *United States v. Davis*, 754 F.3d 1205, 1215 (11th Cir.),

14  *vacated,* 573 Fed. Appx. 925 (11th Cir. 2014), *and reheard en banc in part*, 785 F.3d 498

15  (11th Cir. 2015)).  Judge Illston did not reach the Fourth Amendment issue with respect

16  to prospective CSLI, but held, as further discussed below at pp. 16-17, that by application

17  of the Communications Assistance of Law Enforcement Act ("CALEA"), 47 U.S.C.

18  § 1002(a)(2), the pen register statute did not authorize access to call-identifying

19  information from telecommunications carriers that may disclose the subscriber's physical

20  location, and that a showing of probable cause was required to obtain prospective cell

21  site data.  *Id.* at *3-6.  Although the government had not obtained a warrant, the court

22  denied the motions to suppress upon finding that the agents relied in good faith on the

23  magistrate judge's order authorizing a pen register.  *Id.* at *11-12.

24        Judge Koh also held that cell phone users have a reasonable expectation of

25  privacy in historical CSLI, requiring a warrant to obtain such information absent case-

26  specific exceptions.  *In re Appl. for Tel. Info.,* 119 F. Supp. 3d at 1025-26.  There, the

27  government submitted an application to Magistrate Judge Lloyd for an order authorizing it

28  to obtain both historical and prospective CSLI for target cell phones pursuant to the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Stored Communications Act ("SCA"), 18 U.S.C. § 2703(d), which sets forth a "specific

2    and articulable facts" standard that requires a lesser showing than probable cause.

3    Following *Cooper,* Magistrate Judge Lloyd denied the application and required the

4    government to obtain a search warrant to obtain cell site information, whether historical or

5    prospective.  No. 15-xr-90304 HRL (LHK), doc. no. 2.

6         The government appealed Magistrate Judge Lloyd's denial with respect to the

7    application for historical CSLI.  In affirming that decision, Judge Koh articulated several

8    Fourth Amendment principles based on Supreme Court precedent:

9              (1) an individual's expectation of privacy is at its pinnacle
              when government surveillance intrudes on the home; (2) long-
10             term electronic surveillance by the government implicates an
              individual's expectation of privacy; and (3) location data
11             generated by cell phones, which are ubiquitous in this day and
              age, can reveal a wealth of private information about an
12             individual.

13   *In re Appl. for Tel. Info.*, 119 F. Supp. 3d at 1022.  Applying those principles to the

14   government's application for historical CSLI, Judge Koh determined that the information

15   sought by the government was arguably more invasive of an individual's expectation of

16   privacy than the GPS device attached to the defendant's car in *Jones*, noting that when

17   the government uses CSLI data to obtain information about one's location and

18   movements, (1) "an individual will invariably enter constitutionally protected areas, such

19   as private residences" and (2) the government would "get more information, more data

20   points, on the cell phone via historical CSLI" compared to GPS tracking of a car, because

21   cell phones typically accompany the user wherever she goes.  *Id.* at 1023 (internal marks

22   omitted).  Applying the *Katz* test, Judge Koh considered evidence demonstrating that

23   individuals have a subjective expectation of privacy in the historical CSLI associated with

24   their cell phones, and determined that society is prepared to recognize that expectation

25   as objectively reasonable, citing state court decisions recognizing a reasonable

26   expectation of privacy in CSLI.  *Id.* at 1024-26.  Upon determining that the third party

27   doctrine did not defeat that reasonable expectation of privacy, and that no exception to

28

9

1   the warrant requirement was applicable, Judge Koh held that the Fourth Amendment

2   requires the government to secure a warrant to obtain historical CSLI.  *Id.* at 1040.

3          In *United States v. Williams, et al.,* 2016 WL 492934 (N.D. Cal. Feb. 9, 2016), No.

4   13-cr-764 WHO, doc. no. 874, Judge Orrick followed *In re Application for Telephone*

5   *Information* and *Cooper* to recognize a reasonable expectation of privacy in one's

6   historical CSLI, requiring probable cause to obtain the historical CSLI from the four

7   moving defendants' cell phones.  Having determined that the government submitted

8   several applications pursuant to the SCA under the lower "specific and articulable facts"

9   standard rather than the probable cause standard, Judge Orrick held that the good faith

10  reliance exception applied and denied the motions to suppress.[1]  2016 WL 492934 at *2.

11         On the specific issue presented here whether using a Stingray to locate a cell

12  phone amounts to a search, the district court for the Southern District of New York held

13  that the DEA's use of a CSS to locate a defendant's apartment "was an unreasonable

14  search because the 'pings' from [the defendant's] cell phone to the nearest cell site were

15  not readily available 'to anyone who wanted to look' without the use of a cell-site

16  simulator."  *United States v. Lambis*, 197 F. Supp. 3d 606, 610 (S.D.N.Y. 2016) (quoting

17  *Knotts,* 460 U.S. at 281), *appeal withdrawn* (Mar. 13, 2017).  The court in *Lambis* rejected

18  the government's contention that there was no reasonable expectation of privacy under

19  the third party doctrine, reasoning that the location information detected by a cell-site

20  simulator is "neither initiated by the user nor sent to a third party," unlike pen register

21  information that is conveyed to a telephone company or cellular provider.  197 F. Supp.

22

23  [1]      By separate order, doc. no. 873, Judge Orrick granted another defendant's motion

24  to suppress historical CSLI obtained under a warrant, which the court determined was not
    supported by probable cause, having recognized a reasonable expectation of privacy in

25  one's historical CSLI.  *United States v. Williams,* 161 F. Supp. 3d 846, 850-57 (N.D. Cal.)
    (order granting A. Gilton's motion to suppress cell phone data) (citing *In re Appl. for Tel.*

26  *Info.* and *Cooper*), *appeal docketed,* No. 16-10109 (9th Cir. March 11, 2016).  The Ninth
    Circuit recently withdrew submission of the appeal from the suppression order pending

27  the Supreme Court's decision in *Carpenter v. United States*, No. 16-402, which presents
    the question whether warrantless search and seizure of historical cell phone records

28  revealing the location and movements of cell phones is permitted under the Fourth
    Amendment.  *Williams*, CR 13-cr-764 WHO, doc. no. 1194.

United States District Court
Northern District of California

3d at 614-15. *See also State v. Andrews*, 227 Md. App. 350, 393 (2016) (holding that people have a reasonable expectation of privacy in real-time cell phone location information, and requiring a search warrant to use a CSS); *State v. Tate*, 357 Wis. 2d 172 (2014) (assuming, without deciding, that use of a Stingray amounted to a Fourth Amendment search requiring a warrant, and holding that the pen register order was sufficiently particularized and based on probable cause).

The government relies on recent circuit court decisions that tracking cell site location information from phone companies is not a search because there is no reasonable expectation of privacy in information shared with cellular service providers under the third party doctrine. *United States v. Graham,* 824 F.3d 421, 435-38 (4th Cir. 2016) (en banc), *pets. for cert. filed sub nom Graham v. United States,* No. 16-6308 (Sept. 26, 2016) *and Jordan v. United States,* No. 16-6694 (Oct. 27, 2016); *United States v. Carpenter,* 819 F.3d 880, 888 (6th Cir. 2016), *cert. granted sub nom Carpenter v. United States,* No. 16-402 (June 5, 2017). Distinguishing these cases, the court in *Lambis* reasoned that unlike CSLI obtained by the wireless carriers, CSS technology has "an additional layer of involuntariness" that renders the third party doctrine inapplicable:

> Unlike CSLI, the "pings" picked up by the cell-site simulator are not transmitted in the normal course of the phone's operation. Rather, "cell site simulators actively locate phones by forcing them to repeatedly transmit their unique identifying electronic serial numbers, and then calculating the signal strength until the target phone is pinpointed."

*Lambis*, 197 F. Supp. 3d at 615 (quoting *Andrews,* 227 Md. App. at 359 n.4). The court in *Lambis* also determined that unlike pen register information or CSLI, "a cell-site simulator does not involve a third party." *Id.* at 616. "With the cell-site simulator, the Government cuts out the middleman and obtains the information directly." *Id. See also Patrick*, 842 F.3d at 543 (noting that by using CSS technology, "law-enforcement officials get the same sort of information that a phone company could provide using its own facilities, and they get it in real time rather than waiting for the phone company to turn

over data").  For the reasons articulated in *Lambis*, the circuit court decisions applying the third party doctrine to historical CSLI are inapposite.

The court adopts Judge Koh's reasoning in *In re Application for Telephone Information,* 119 F. Supp. 3d at 1026, to hold that cell phone users have an expectation of privacy in their cell phone location in real time and that society is prepared to recognize that expectation as reasonable.  While Judge Koh limited her analysis to the privacy interest in historical CSLI, the court determines that cell phone users have an even stronger privacy interest in real time location information associated with their cell phones, which act as a close proxy to one's actual physical location because most cell phone users keep their phones on their person or within reach, as the Supreme Court recognized in *Riley*.  In light of the persuasive authority of *Lambis,* and the reasoning of my learned colleagues on this court recognizing a privacy interest in historical cell site location information, the court holds that Ellis had a reasonable expectation of privacy in his real-time cell phone location, and that use of the Stingray devices to locate his cell phone amounted to a search requiring a warrant, absent an exception to the warrant requirement.

### d.      Privacy Interest in One's Public Movements

Ellis further argues that because a Stingray can track an individual's location by locating his cell phone with an accuracy of about two meters, its use infringed upon his reasonable expectation of privacy in one's public movements, as considered by Justice Sotomayor in her concurring opinion in *Jones*: "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations. . . . I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements."  Doc. no. 304 at 16 (citing *Jones,* 565 U.S. at 415-16 (Sotomayor, J., concurring)).  The Court in *Jones* did not reach the question whether the Fourth Amendment protects a privacy interest in one's public movements, and even Justice Sotomayor did not attempt to

1    resolve these "difficult questions" because "the Government's physical intrusion on

2    Jones' Jeep supplies a narrower basis for decision."  *Id.* at 418.  Accordingly, Ellis fails to

3    establish that a reasonable expectation of privacy in one's public movements that is

4    protected under the Fourth Amendment has been recognized by any court.

5           **B.     Pen Register Procedures**

6           The government argues that even if use of the Stingray devices amounted to a

7    search, the search was reasonable because it was conducted pursuant to the emergency

8    provisions of the pen register statute, in combination with provisions of the Stored

9    Communications Act.  The government further argues that a warrant was not required to

10   conduct the search pursuant to the exception for exigent circumstances, and that the

11   exceptions to the exclusionary rule for good faith reliance and/or inevitable discovery are

12   also applicable.

13          The pen register statute and the SCA set forth different standards to authorize

14   different methods of electronic surveillance.  The provisions for authorizing a pen register

15   and/or a trap and trace device under Title III of the Electronic Communications Privacy

16   Act of 1986 ("ECPA"), codified as amended at 18 U.S.C. §§ 3121-3127 (referred to

17   throughout as the "pen register statute"), require a government attorney merely to "certify"

18   the relevance of the information likely to be obtained, without requiring a factual basis for

19   the certification. 18 U.S.C. §§ 3122 and 3123 (requiring the court to enter "an ex parte

20   order authorizing the installation and use of a pen register or trap and trace device

21   anywhere within the United States, if the court finds that the attorney for the Government

22   has certified to the court that the information likely to be obtained by such installation and

23   use is relevant to an ongoing criminal investigation").  The SCA, enacted under Title II of

24   the ECPA, as amended, provides that the government may require a provider of

25   electronic communication service or remote computing service to disclose a subscriber's

26   records, without the contents of communications, by obtaining either (A) a warrant, or (B)

27   a court order upon a showing of "specific and articulable facts showing . . . reasonable

28   grounds to believe that . . . the records or other information sought, are relevant and

United States District Court
Northern District of California

13

material to an ongoing criminal investigation." 18 U.S.C. §§ 2703(c)(1) and (d).  The

"specific and articulable facts" standard under the SCA requires a higher showing than

the certification required by the pen register statute, but does not require probable cause.

Under the emergency provisions of the pen register statute, a law enforcement

officer who reasonably determines that an emergency situation exists may have a pen

register or trap and trace device installed without a prior court order only if an order

approving the installation or use is issued within forty-eight hours after the installation has

occurred, or begins to occur.  18 U.S.C. § 3125.  The provision for "Emergency Pen

Register And Trap And Trace Device Installation" narrowly defines a covered

"emergency" to involve specific circumstances, two of which the government asserts

authorized the use of the emergency provisions here:  (A) immediate danger of death or

serious bodily injury to any person; and (B) conspiratorial activities characteristic of

organized crime.  18 U.S.C. §§ 3125(a)(1)(A) and (B).  The officers' sworn statements,

including affidavits filed under seal in this case, establish that the OPD had reason to

believe that there was an emergency where (A) the immediate safety of officers and/or

public citizens was at risk and (B) the emergency involved the conspiratorial activities of

organized crime, based on information that Ellis was a known member of a gang who

was involved in an attempted murder at a bus stop on January 20, who was near the

shooting of a police officer earlier that evening on January 21, and who was believed to

be in possession of guns.

It is undisputed that the OPD and FBI did not seek issuance of a search warrant to

operate the Stingray devices, but only obtained an order authorizing pen register and/or

trap and trace devices (the "pen register order").  Here, the state court judge issued an

order pursuant to both the SCA and the pen register statute ("18 United States Code

Section 2703(c)(d), 3122, 3123") requiring the service providers to provide the FBI and

the OPD with pen registers "to register numbers dialed or pulsed[,] to record the date and

time[,] to record the length of time[,] and to receive cell site and/or location sites," as well

as trap and trace devices, for the target phone number which the application

14

1   demonstrated was used by Ellis.  Doc. no. 321, Ex. F.  The court order also required the

2   wireless carriers to provide, "on an ongoing and/or real-time basis, the location of cell

3   site/sector (physical address) at call origination (for outbound calls), call termination (for

4   incoming calls), and, during the progress of a call, the direction and strength of a signal"

5   for the target phone.  The government does not contend that the order authorizing the

6   use of pen register and/or trap and trace devices here was supported by a finding of

7   probable cause.  The pen register order does not make a probable cause finding, but

8   only a finding of "specific and articulable facts establishing reasonable grounds to believe

9   the listed records are relevant and material to an ongoing criminal investigation" pursuant

10  to the SCA, 18 U.S.C. §§ 2703(c)(1)(B) and (d).  Doc. no. 321, Ex. F.

11          Ellis contends that the pen register order was not sufficient to authorize the use of

12  the Stingray devices, which required a warrant.  As an initial matter, Ellis challenges the

13  government's factual assertion that the Stingrays were configured as pen registers and/or

14  trap and trace devices, doc. no. 321 at 9 and Exs. G-J, given that Stingrays also have the

15  capability of intercepting the content of communications, not just information about

16  numbers dialed in or dialed out.  Doc. no. 324 at 3.  *See* 18 U.S.C. § 3127(3) and (4)

17  (defining pen register as a device which "records or decodes dialing, routing, addressing,

18  or signaling information" transmitted by the target phone on outgoing calls, and a trap and

19  trace as a device which captures information from incoming calls made to the target

20  phone, but not contents of any communication).  Although Ellis seeks supporting

21  evidence about how the specific Stingray devices were configured and the capabilities of

22  each device, the sworn affidavits of the OPD and FBI agents are sufficient to establish

23  that the Stingrays used here were configured as pen registers and/or trap and trace

24  devices and were not capable of capturing any content.  Doc. no. 321 at 9 and Exs. G-J.

25  There is no evidence in the record suggesting that the Stingrays captured the content of

26  any communications, and an evidentiary hearing to determine the mechanical details

27  about the Stingray devices is not warranted.

28

United States District Court
Northern District of California

1    Ellis further argues that even if the government had obtained a search warrant

2    authorizing the use of the Stingrays, the warrant would be invalid for lack of particularity

3    because a cell site simulator is capable of collecting information from anyone's phone

4    that was within range.  Doc. no. 304 at 19.  He suggests that the FBI and OPD used the

5    Stingrays to monitor potentially hundreds of individuals' phone calls.  *Id.* at 22.  This is a

6    purely speculative argument given the sworn affidavits of the Stingray operators stating

7    that the devices were configured to look for the phone number that belonged to Ellis.

8    Doc. no. 321, Exs. G ¶ 8 (OPD officer) and I ¶ 10 (FBI agent).  There is no evidence to

9    suggest that Stingrays were set up to sweep all cell phones in the area, and such a

10   configuration would be inconsistent with the purpose for using the Stingrays, which was

11   to find Ellis by locating his cell phone.

12   The government contends that since the Stingray devices used in this case were

13   configured in compliance with the pen register statute, then the provisions of the pen

14   register statute, including the "emergency" provisions, govern their operation.  Doc. no.

15   321 at 9 (citing 18 U.S.C. § 3125).  The government does not address the key issue in

16   dispute, namely, whether the provisions of the pen register statute and the SCA provide

17   the appropriate standard for using a CSS to locate a cell phone in real-time.  The court

18   follows Judge Illston's determination in *Cooper,* 2015 WL 881578, that the provisions of

19   the pen register statute and the SCA do not authorize the use of a CSS to disclose real-

20   time information about a cell phone user's physical location, and that such location

21   monitoring must be authorized by a showing of probable cause.

22   In *Cooper*, the government collected both historical and prospective CSLI from

23   Metro PCS pursuant to orders authorizing pen register, trap and trace, and cell site data,

24   without the use of Stingrays or similar devices, and the defendant challenged the failure

25   to show probable cause to obtain cell site data.  With respect to obtaining prospective

26   CSLI, the government argued in *Cooper* that it was not required to show probable cause

27   but only needed to satisfy the provisions of the pen register statute, 18 U.S.C. § 3123,

28   and the SCA, 18 U.S.C. § 2703(d).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    With respect to real time CSLI, Judge Illston held that under the CALEA, which

2    amended the ECPA, the government is prohibited from relying solely on the provisions of

3    the pen register statute to obtain cell site data that discloses the physical location of the

4    subscriber. *Cooper*, 2015 WL 881578 at *3 (citing 47 U.S.C. § 1002(a)(2)(B) ("with

5    regard to information acquired solely pursuant to the authority for pen registers and trap

6    and trace devices [ ], such call-identifying information shall not include any information

7    that may disclose the physical location of the subscriber)).  Judge Illston noted that the

8    CALEA did not explicitly establish a standard for obtaining cell site data, and applied the

9    "default" probable cause standard of Rule 41 of the Federal Rules of Criminal Procedure.

10   *Id.* (citations omitted).  *See* Fed. R. Crim. P. 41(d)(1) ("After receiving an affidavit or other

11   information, a magistrate judge--or if authorized by Rule 41(b), a judge of a state court of

12   record--must issue the warrant if there is probable cause to search for and seize a person

13   or property or to install and use a tracking device.").  Judge Illston rejected the

14   government's hybrid theory that combining the SCA with the pen register statute to obtain

15   prospective cell site data would comply with the CALEA, reasoning that Congress

16   intended that the SCA "was to be used as a means to obtain data which has **already**

17   **been stored** at the time the government seeks to obtain it," as opposed to real-time data.

18   *Cooper*, 2015 WL 881578 at *4-5 (emphasis added).

19   Here, the government has provided declarations stating that the OPD and FBI

20   configured the Stingray devices to locate the target cell phone, not broadly tracking all

21   cell phone signals in the apartment building, making the Stingray use here similar to use

22   of a beeper that was tracked inside a home, as in *Karo,* 468 U.S. at 715 ("the monitoring

23   indicated that the beeper was inside the house, a fact that could not have been visually

24   verified").  Given the undisputed fact that the Stingray devices were configured to locate

25   Ellis's cell phone, the court adopts Judge Illston's reasoning in *Cooper* to hold that by

26   application of 47 U.S.C. § 1002(a)(2), the pen register statute in combination with the

27   SCA does not authorize obtaining cell phone location information through pen register or

28   trap and trace devices, and that a warrant supported by a showing of probable cause is

1   required to use a Stingray to locate a cell phone.  The court further holds that the

2   "specific and articulable facts" standard under the SCA does not govern the use of a

3   Stingray on the separate ground that the SCA authorizes the disclosure of

4   communications or records kept by third party service providers, not direct surveillance of

5   cell phone location by the government.

6       The government raises a cursory argument that the search of Ellis's cell phone

7   location information was a valid probation search, contending that the more intrusive

8   search of the contents of his cell phone was valid under the four-way search condition of

9   his probation.  Doc. no. 321 at 16 (citing 10/29/15 Order, hereby designated "Pretrial

10  Order No. 2," at 19).  The government cites no authority for this proposition, given that

11  the privacy interest in one's cell phone location, which could be a proxy for one's

12  personal location, is more akin to the privacy interests against GPS tracking or GPS

13  monitoring, which was not a condition of Ellis's probation.

14      Accordingly, the warrantless searches were unreasonable, unless the exigent

15  circumstances exception to the warrant requirement applies.  If the court finds that no

16  exception to the warrant requirement applies, the government seeks an exception from

17  the exclusionary rule for good faith reliance or inevitable discovery.

18          **C.**      **Exception to Warrant Requirement for Exigent Circumstances**

19      The government argues that if a warrant was required to use a Stingray to locate a

20  cell phone, the warrantless searches here were reasonable due to exigent circumstances

21  which relieved law enforcement of the warrant requirement.  Doc. no. 321 at 10 (citing

22  *Kentucky v. King*, 563 U.S. 452, 460 (2011) and *Murdock v. Stout,* 54 F.3d 1437, 1441

23  (9th Cir. 1995), *abrogated on other grounds by United States v. Ramirez,* 523 U.S. 65, 69-

24  70 (1998)).  The government identifies several factors known to law enforcement to

25  demonstrate exigent circumstances at the time the OPD and FBI deployed the Stingrays:

26          i.    Ellis was identified by an eyewitness as the get-away driver in an
               attempted murder on January 20, 2013;

27

28          ii.   The same eyewitness identified the license plate number of the car
               Ellis was driving, and that car was located in the rear lot of the

apartment building where Ellis lived;

iii.   The next day, an Oakland police officer investigating the get-away car was attacked, beaten, and shot while Ellis stood in the driveway of the apartments;

iv.   Ellis was in the driveway when the assault occurred;

v.   The guns stolen from the officer were in Ellis's room;

vi.   In the days immediately preceding the shooting, Ellis was in possession of a large number of firearms;

vii.   Ellis was a known member of a gang with a violent history; and

viii.   Ellis lived at the 1759 Seminary Apartment complex, but officers did not know his location.

Doc. no. 321 at 8. Having reviewed the affidavits in the record, including the unredacted search warrant affidavits and pen register application filed ex parte under seal, the court determines that these circumstances were known to OPD officers by the early morning of January 22, 2013, when the first Stingray was deployed. See doc. no. 321, Ex. M (under seal). Ellis disputes the government's factual assertions (iii) and (iv) suggesting that he was involved in the assault and shooting of the OPD officer. Doc. no. 324 at 2. Officer Saunders' redacted pen register application indicates, however, that B.O.T., known to be Ellis, was "in the driveway when the shooting happened." Doc. no. 304, Ex. I.

Under the exigency exception to the warrant requirement, officers may make a warrantless search if: (1) they have probable cause to believe that the item or place to be searched contains evidence of a crime, and (2) they are facing exigent circumstances that require immediate police action. *United States v. Camou*, 773 F.3d 932, 940 (9th Cir. 2014). Exigent circumstances are defined as "'those circumstances that would cause a reasonable person to believe that entry [or search] ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *Id.* (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc), *overruled on other grounds by Estate of Merchant v. Comm'r*, 947 F.2d 1390, 1392–93 (9th Cir. 1991)). "To be reasonable, a search under this exception

United States District Court
Northern District of California

1   must be limited in scope so that it is 'strictly circumscribed by the exigencies which justify

2   its initiation.'"  *Id.* (quoting *Mincey v. Arizona,* 437 U.S. 385, 393 (1978)).

3          Ellis disputes that any exigencies justified use of the Stingrays without a warrant

4   sometime after 2:11 a.m., where earlier that evening, by 8:45 p.m., Ellis and other

5   suspects had already been determined to be in the apartment building which had been

6   surrounded by the SWAT team "to contain any suspects."  Doc. no. 324, Ex. C.  Ellis also

7   points out that the officers had time to apply for and obtain three separate search

8   warrants late at night and into the morning, particularly the warrant to search Apartments

9   108, 110 and 112, which Judge Horner issued at 1:05 am, indicating that the situation did

10  not prevent the OPD and FBI from seeking court authorization to use the Stingrays.  Doc.

11  no. 324 at 7; doc. no. 321, Ex. B (search warrant).

12         Because the OPD and FBI proceeded on the premise that the Stingrays were

13  subject to the emergency provisions of the pen register statute, rather than a warrant

14  requirement, the government contends that the officers followed the statutory procedures

15  by securing an order authorizing use of the Stingray devices within 48 hours of using the

16  device.  Doc. no. 321 at 9-10 (citing 18 U.S.C. § 3125). The order was issued on January

17  22, 2013, the same day the Stingrays were used, although the exact time the order was

18  issued is not known.

19         The government argues that exigent circumstances excused the requirement to

20  obtain a warrant to locate Ellis's cell phone, but Ellis responds that he was not known to

21  have assaulted or directly threatened violence against the victim in either of the

22  shootings.  The record demonstrates, however, that Ellis was a known suspect involved

23  as a getaway driver in the January 20 shooting and was near the January 21 shooting in

24  the driveway.  Though Ellis was not known to be the shooter, he was believed to be a

25  suspect in possession of firearms.  The need to prevent escape by a suspect presented

26  exigent circumstances here.  *McConney,* 728 F.2d at 1199.  Although Ellis was not

27  involved in an armed standoff situation, the timeline of events and the facts presented in

28  the unredacted pen register application demonstrate that law enforcement officers on the

1  scene believed that any unnecessary delay in finding Ellis would endanger their lives or

2  the safety of others and/or that speed was essential to prevent his escape.  *See Fisher v.*

3  *City of San Jose*, 558 F.3d 1069, 1075 (9th Cir. 2009) (en banc) (where exigent

4  circumstances justified seizure of the suspect who was seen pointing a rifle at police

5  officers, loading his rifles, and arranging them strategically throughout his apartment to

6  repel any entry by the police, police were not required to obtain an arrest warrant to take

7  the suspect into full physical custody over twelve hours later).

8        The declarations and documents in support of the government's opposition, doc.

9  no. 321, indicate the following sequence of events on the night of January 21 to January

10  22, 2013, as cited below.

| | |
|---|---|
| 9:00 pm | At about 9:00 pm, the Stingray operator for the OPD arrived at the scene, and helped deploy the SWAT robots soon after arriving.  Ex. G ¶ 10. |
| 10:41 pm | Police held a perimeter on the apartment building at 1759 Seminary, and continued to search nearby houses, roofs, yards and a creek. 8/17/15 Order at 9. |
| 11:15 pm | OPD prepared an Exigent Circumstance Request to MetroPCS asking for call detail records, cell sites and pen register information for Ellis's cell phone number. Ex. A. |
| 11:55 pm | Officers end the yard search and focus on 1759 Seminary.  8/17/15 Order at 9. |
| 1:05 am | Judge Horner signed the warrant authorizing the search of Apartments 108, 110, and 212.  Ex. B. |
| 1:47 am | OPD starts making announcements for "everyone to stay away frm windows," and preparing to send bean bags into Apartment 212. Doc. no. 304, Ex. M (CAD reports). |
| 2:11 am | OPD Officer Saunders faxed a Pen Worksheet for Ellis's number to Metro PCS, asking to "start pen register if phone is active and being used," implying that the pen register had not yet been provided. Ex. C. Sometime after that request was faxed, OPD obtained the pen register information and deployed the Stingray. Ex. G  ¶¶ 11, 12 (indicating the OPD Stingray operator did not begin operating the Stingray until after OPD obtained the pen register information from the telephone provider, and began operating the Stingray sometime after midnight in the early hours). |
| 3:41 am | OPD searched Apartment 212, finding both handguns taken from Officer K. plus a third pistol, and keys to the white Dodge Avenger |

getaway car from the January 20 daytime shooting.  8/17/15 Order at 10.

7:00 am      At approximately 7:00 am, the FBI Stingray operator was notified that OPD requested assistance from the FBI in the use of its cell site simulator.  Ex. I ¶ 8.

7:30 am      The FBI sent MetroPCS an Exigent Circumstances Request for pen register information on Ellis's phone.  Ex. D; Ex. I  ¶  9.

9:00 am      The FBI Stingray operator arrived at the scene.  Ex. I  ¶  10.

10:00 am     OPD powered off its Stingray and purged the data, and the FBI began operating its Stingray.  Ex. G  ¶ 13, 15; Ex. I ¶ 10.  The FBI Stingray was operated for about one hour before Ellis's phone was located.  Ex. I ¶ 10.

10:52 am     Apartment 112 was cleared, and Ellis and the other occupants were escorted out.  Ex. L (radio purge excerpt)

Ellis suggests that OPD had sufficient time to obtain a warrant to deploy the Stingrays as demonstrated by the issuance of the search warrant for Apartments 108, 110 and 212 in the early hours of January 22.  To explain why a warrant or pen register order was not obtained before deploying the Stingrays, the government has demonstrated that OPD proceeded under the emergency pen register procedures and that OPD otherwise would have needed to wait until normal business hours to submit a pen register order to MetroPCS.  Doc. no. 321, Ex. K.  Indeed, it is worth noting that the factual basis for demonstrating probable cause for issuance of the warrant authorizing the search of Ellis's apartment would have likely been found to support probable cause for the OPD to use the Stingray device to locate Ellis by locating his cell phone, if a separate warrant had been sought, based on the showing of a fair probability that evidence of a crime would be found.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  *See* doc. no. 307, Ex. E (search warrant affidavit sworn at 1:05 a.m. on 1/22/2013).

Ellis also suggests that there was no exigency requiring a warrantless search to prevent flight and to prevent harm to the officers and others because OPD knew that Ellis was somewhere inside the apartment building, rather than outside where police had conducted a search of nearby houses and yards.  However, OPD obtained a warrant to search Ellis's residence, Apartment 212, and he was not there, leaving the entire building

22

United States District Court
Northern District of California

1    to remain under siege all night as OPD continued to look for Ellis.  Under these

2    circumstances, the use of the Stingray by OPD to locate Ellis's cell phone was justified by

3    exigent circumstances, based on risk of flight and the belief that Ellis was in possession

4    of firearms.  The FBI's use of the second Stingray device was a continuation of the

5    OPD's initial search for Ellis's cell phone location.  *See Fisher,* 558 F.3d at 1077-78

6    ("officers were not required to periodically reassess whether the exigency persisted

7    throughout the standoff because the standoff was 'no more than an actual continuation'

8    of the actual seizure" and the exigent circumstances did not materially change) (citing

9    *Michigan v. Tyler*, 436 U.S. 499, 511 (1978) (warrantless entry into burning building to

10   extinguish fire and conduct search to determine its cause was justified by exigency, and

11   warrantless post-fire search four hours later, despite the absence of exigent

12   circumstances, was upheld as a continuation of the initial search); *United States v.*

13   *Echegoyen*, 799 F.2d 1271, 1280 (9th Cir. 1986) (where exigent circumstances justified

14   initial warrantless entry, subsequent entry by narcotics officers to inspect the premises for

15   a possible fire hazard was merely a continuation of the initial lawful entry because both

16   were done to alleviate the exigent circumstances)).  *Cf. Michigan v. Clifford*, 464 U.S.

17   287, 296 (1984) (post-fire search for evidence of arson "was not a continuation of an

18   earlier search" where the homeowners made a reasonable effort to secure their fire-

19   damaged home after the blaze was extinguished and the fire and police units left the

20   scene about six hours earlier, distinguishing *Tyler*).

21          Accordingly, the court determines that a warrant was not required to deploy the

22   Stingrays to locate Ellis's cell phone under the exigent circumstances that existed the

23   morning of January 22, 2013.  Ellis's motion to suppress evidence obtained from use of

24   the Stingrays is therefore DENIED.

25          Notwithstanding this determination, the court proceeds to consider the exceptions

26   to the exclusionary rule for good faith reliance and/or inevitable discovery asserted by the

27   government as separate grounds for denying the motion to suppress.

28

United States District Court
Northern District of California

1

**D.     Exceptions to Exclusionary Rule**

2

**1.     Good Faith Reliance**

3        The government argues that even if a warrant had been required to authorize the

4   use of the Stingrays, the OPD officers and FBI agents reasonably relied in good faith on

5   the pen register order, issued under the emergency procedures of the pen register

6   statute, 18 U.S.C. § 3125, to use the Stingrays to locate Ellis's cell phone.

7        The "good faith" exception to the exclusionary rule established by *United States v.*

8   *Leon*, 468 U.S. 897 (1984), is satisfied if an officer acts "in objectively reasonable

9   reliance" on a defective warrant.  *See United States v. Underwood*, 725 F.3d 1076, 1084

10  (9th Cir. 2013).  "To determine whether the officer acted in objectively reasonable

11  reliance, 'all of the circumstances - including whether the warrant application had

12  previously been rejected by a different magistrate - may be considered.'"  *Id.* (citing *Leon*,

13  468 U.S. at 922 n. 23; *Messerschmidt v. Millender*, 565 U.S. 535, 132 S. Ct. 1235, 1249-

14  50 (2012)).  The burden of demonstrating good faith rests with the government.  *Id.*

15       The Court in *Leon* identified four situations that per se fail to satisfy the good faith

16  exception: (1) where the affiant recklessly or knowingly placed false information in the

17  affidavit that misled the issuing judge; (2) where the judge "wholly abandon[s] his [or her]

18  judicial role"; (3) where the affidavit is "so lacking in indicia of probable cause as to render

19  official belief in its existence entirely unreasonable" (in other words, a "bare bones"

20  affidavit); and (4) where the warrant is "so facially deficient - i.e., in failing to particularize

21  the place to be searched or the things to be seized - that the executing officers cannot

22  reasonably presume it to be valid."  *Underwood*, 725 F.3d at 1085 (citing *Leon*, 468 U.S.

23  at 922-23) (internal quotation marks omitted).  "In these situations, 'the officer will have

24  no reasonable grounds for believing that the warrant was properly issued.'"  *Id.* (quoting

25  *Leon*, 468 U.S. at 922–23).

26       Ellis argues that any good faith reliance argument is foreclosed by the fact that

27  Officer Saunders's application failed to disclose to the issuing judge that the OPD and

28  FBI planned to use the Stingray devices, rather than more traditional pen register and

24

trap and trace methods.  Ellis points out that the pen register application does not, on its face, seek authorization to use a Stingray.  Doc. no. 324 at 4-5.  Under Ninth Circuit authority, however, the particular means of executing a warrant need not be specifically authorized, though it is subject to judicial review for reasonableness if challenged.  *United States v. Chen*, 979 F.2d 714, 720 (9th Cir. 1992) (following *Dalia v. United States*, 441 U.S. 238, 258-59 (1979) ("It would extend the Warrant Clause to the extreme to require that, whenever it is reasonably likely that Fourth Amendment rights may be affected in more than one way, the court must set forth precisely the procedures to be followed by the executing officers.")).  In *Dalia*, the Court held that the Fourth Amendment requires that search warrants must be issued by neutral, disinterested magistrates; that those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense; and that warrants must particularly describe the things to be seized, as well as the place to be searched, but do not require "a specification of the precise manner in which they are to be executed."  *Dalia*, 441 U.S. at 255, 257 (citations and internal marks omitted).  *See Patrick,* 842 F.3d at 544 ("neither constitutional text nor precedent suggests that 'search warrants also must include a specification of the precise manner in which they are to be executed'") (citing *Richards v. Wisconsin*, 520 U.S. 385 (1997) and *Dalia*, 441 U.S. at 256).  In light of this authority, it was reasonable for Officer Saunders not to disclose the particular manner of execution in his application for a pen register order authorizing location information for Ellis's cell phone, including cell site/sector location and "direction and strength of a signal" for his telephone number.

Ellis also challenges the pen register order on the ground that the order authorizing use of the devices for a period of 30 days from the date of the order could not have authorized the use of any device before the order was signed on January 22, 2013, but the government has explained that the statutory provisions for emergency pen register applications permit such post hoc authorization.  18 U.S.C. § 3125.  Ellis further challenges the pen register order because the government has failed to produce the

1    original, but the lack of an original does not warrant suppression in light of other evidence

2    in the record demonstrating that the pen register order was issued by Judge Horner.

3          Here, there are no indicia of bad faith where the Stingray operators have attested

4    that the OPD and FBI configured the Stingrays as pen registers, without capturing any

5    content of communications, and sought authorization under the pen register statute in

6    combination with the SCA.  The government points out that under then-existing FBI

7    policy, a warrant was not required before using a cell site simulator.  *See* doc. no. 304

8    Ex. B (FBI Electronic Surveillance Manual at 41).  The excerpt of a manual cited by Ellis

9    further instructed that cell site simulators were covered by the definition of a pen register

10   in 18 U.S.C. § 3127(3) as amended by the USA Patriot Act of 2001, Pub.L. 107–56,

11   October 26, 2001, 115 Stat. 272.  Doc. no. 304, Ex. O (USABook).  That DOJ policy has

12   since been amended, effective September 3, 2015, to require a warrant to operate a

13   CSS.  *See Lambis,* 197 F. Supp. 3d at 611.

14         At the time the CSS technology was used in this case, there was no controlling

15   authority as to whether its use constituted a search requiring issuance of a warrant.  In

16   this district, Judge Illston's unpublished decision in *Cooper,* 2015 WL 881578, requiring a

17   showing of probable cause to obtain prospective cell site location information, was not

18   issued until two years after the Stingrays were used in this case in January 2013.

19         On the other hand, there is out-of-district authority indicating that prior to 2013, the

20   government applied for tracking warrants within this district, supported by a showing of

21   probable cause, to use mobile tracking devices that acted like cell site simulators.  In

22   *Rigmaiden,* the government obtained a tracking warrant in this district issued in 2008 by

23   then-Magistrate Judge Seeborg to use a mobile tracking device which functioned as a

24   cell site simulator to locate the defendant's aircard.  *United States v. Rigmaiden*

25   ("*Rigmaiden I*")*,* 844 F. Supp. 2d 982, 995 (D. Ariz. 2012) ("The mobile tracking device

26   mimicked a Verizon Wireless cell tower and sent signals to, and received signals from,

27   the aircard.").  The government conceded there, for purposes of the defendant's requests

28   for discovery related to his suppression motions, that the aircard tracking operation was a

26

United States District Court
Northern District of California

Fourth Amendment search and seizure and that the government would rely on the Rule 41 tracking warrant, application, and affidavit to authorize the use of the tracking device to communicate directly with the defendant's aircard and determine its location.  *Id.* at 996 (citing *In re Application of the US for an Order Authorizing the Use and Monitoring of a Mobile Tracking Device*, No. 08-xr-90330-RS (N.D. Cal.)).  After conducting an ex parte hearing, and in light of the government's factual admissions and concessions, the Arizona district court denied the defendant's motions for disclosures and additional discovery.  *See id.* at 1005 ("The Court concludes that Defendant has ample information with which to construct his Fourth Amendment arguments.").  The court subsequently denied Rigmaiden's motion to suppress evidence with respect to the FBI's use of the mobile tracking device after determining that the tracking warrant was supported by probable cause.  *United States v. Rigmaiden* ("*Rigmaiden II*")*,* 2013 WL 1932800 (D. Ariz. May 8, 2013).  The court in *Rigmaiden II* initially determined that the defendant did not have a reasonable expectation of privacy in the aircard that was obtained through fraud.  2013 WL 1932800 at *6-9.  The Arizona district court did not, however, reach the issue whether use of a CSS required a warrant even if there was a protected privacy interest because the government conceded that use of a CSS-type mobile tracking device to track the aircard was a Fourth Amendment search and relied on a warrant, which the court found was supported by probable cause and sufficient particularity.

Prior to 2013, the few out-of-district courts presented with the question whether law enforcement was required to obtain a warrant or a pen register/trap and trace order to operate a cell site simulator, or similar device, issued differing opinions.  *Compare In re Application of the U.S. for an Order Authorizing Use of a Cellular Telephone Digital Analyzer* ("*In re Appl. Digital Analyzer*"), 885 F. Supp. 197, 202 (C.D. Cal. 1995) (holding that no court order is required for law enforcement agents to use a digital analyzer to detect only the electronic serial number and phone number of the subject cellular telephone and the numbers being called, but, to the extent an order could be fashioned, requiring certain provisions analogous to an order authorizing a pen register and trap and

trace device pursuant to 18 U.S.C. § 3123(b)) *with In re Application of the U.S. for an Order Authorizing the Installation & Use of a Pen Register & Trap & Trace Device*, 890 F. Supp. 2d 747, 748 (S.D. Tex. 2012) (denying application for order authorizing the installation and use of a pen register and trap and trace device to operate "stingray" in the absence of authority that pen register statute, rather than warrant requirement, applies to stingray equipment) (citing *In re Appl. Digital Analyzer*).

In determining whether to apply the exclusionary rule in the absence of settled authority applicable to the use of new investigative technology, the court considers the Supreme Court's observation that "under *Leon*'s good faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." *Davis v. United States*, 564 U.S. 229, 240 (2011) (citing *Herring v. United States*, 555 U.S. 135, 144 (2009)).

> When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. [*Herring*, 555 U.S. at 144.] But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon*, [468 U.S.] at 909, or when their conduct involves only simple, "isolated" negligence, *Herring, supra*, at 137, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way." *See Leon, supra*, at 919, 908, n. 6 [internal citation omitted].

*Id.* at 238. Here, the law enforcement officers took steps to obtain court authorization under the pen register procedures that they believed were applicable to use of the Stingrays for tracking the location of Ellis's cell phone. Officer Saunders's application did not mislead the issuing judge about the purpose of the pen register order, which included locating Ellis's cell phone with information about "cell site and/or location sites" and "on an ongoing and/or real-time basis, the location of cell site/sector (physical address)" for outbound and incoming calls and "the direction and strength of a signal" during a call in progress. The application articulated specific facts and circumstances giving rise to the need to locate Ellis and his coconspirators. The pen register order did not amount to a

United States District Court
Northern District of California

1   mere "rubber stamp" or otherwise indicate that the judge wholly abandoned his judicial

2   role in approving the pen register application.

3          Under the totality of the circumstances, where the state court judge had reviewed

4   a detailed affidavit which he found demonstrated probable cause to issue a search

5   warrant earlier that morning, at 1:05 a.m., the OPD and FBI Stingray operators

6   reasonably relied on the emergency pen register procedures to deploy the Stingray

7   devices.  In particular, the FBI relied in objectively good faith on then-current DOJ policy

8   and practice construing the pen register statute to cover the use of cell site simulators.  In

9   *Illinois v. Krull*, 480 U.S. 340, 349 (1987), the Supreme Court recognized that the *Leon*

10  exception applies if officers obtain evidence in objectively reasonable reliance on a

11  statute that is subsequently declared unconstitutional, reasoning that "[t]here is no basis

12  for applying the exclusionary rule to exclude evidence obtained when a law enforcement

13  officer acts in objectively reasonable reliance upon a statute, regardless of whether the

14  statute may be characterized as 'substantive' or 'procedural.'" *Id.* at 356 n.12.  In

15  weighing whether suppression would have significant deterrent effect, the court in *Krull*

16  determined as follows:

17              There is nothing to indicate that applying the exclusionary rule
                to evidence seized pursuant to the statute prior to the
18              declaration of its invalidity will act as a significant, additional
                deterrent. Moreover, to the extent that application of the
19              exclusionary rule could provide some incremental deterrent,
                that possible benefit must be weighed against the "substantial
20              social costs exacted by the exclusionary rule."  [*Leon*, 468
                U.S. at 907.]  When we indulge in such weighing, we are
21              convinced that applying the exclusionary rule in this context is
                unjustified.
22

23  *Krull*, 480 U.S. at 353.

24          Because the FBI proceeded here under a mistaken understanding of the statute,

25  rather than a statute that has been found unconstitutional, *Krull* does not squarely apply.

26  However, the *Krull* analysis is instructive to determine whether applying the exclusionary

27  rule would have significant deterrent effect to warrant suppression of evidence.  Law

28  enforcement's view that the use of the Stingrays was authorized under the provisions of

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the pen register statute, an unsettled question that has yet to be decided by any appellate

2    authority, is distinguishable from a mistaken understanding of the law supporting a belief

3    that a suspect has broken the law.  *Cf. United States v. Lopez-Soto*, 205 F.3d 1101,

4    1106–07 (9th Cir. 2000) (officer lacked reasonable suspicion to stop defendant based on

5    mistaken belief about proper placement of registration sticker).  While the court holds that

6    probable cause is required to use CSS devices to pinpoint the location of a cell phone,

7    the OPD and FBI's reliance four years ago on the view that the pen register statute

8    governed the use of the Stingrays, which were configured so as not to capture any

9    content of communications, was not objectively unreasonable.

10          Where the OPD had applied for and obtained a search warrant for Ellis's

11    apartment before the Stingrays were deployed, and Officer Saunders applied for a pen

12    register order that authorized wireless carriers to provide law enforcement with cell

13    site/sector location information for Ellis's phone, for which the issuing judge did not

14    require a showing of probable cause, the OPD and FBI used the Stingrays in objectively

15    reasonable reliance on the emergency provisions of the pen register statute and the pen

16    register order.  The court finds that the officers were acting "as a reasonable officer would

17    and should act in similar circumstances," such that "excluding the evidence can in no way

18    affect [their] future conduct unless it is to make [them] less willing to do his duty," so as to

19    warrant the good faith reliance exception.  *United States v. Crews*, 502 F.3d 1130, 1136

20    n.4 (9th Cir. 2007) (citing *Leon*, 468 U.S. at 920) (internal marks omitted).  Accordingly,

21    the motion to suppress is DENIED on this additional ground.

22                    **2.      Inevitable Discovery**

23          The government also argues that under the inevitable discovery doctrine, Ellis

24    undoubtedly would have been located by the OPD inside the apartment building, even

25    without the use of the Stingray devices.

26          The inevitable discovery exception to the exclusionary rule permits the admission

27    of otherwise excluded evidence "if the government can prove that the evidence would

28    have been obtained inevitably and, therefore, would have been admitted regardless of

United States District Court
Northern District of California

1    any overreaching by the police. . . ."  *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir.

2    2000) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)).  "If the prosecution can

3    establish by a preponderance of the evidence that the information ultimately or inevitably

4    would have been discovered by lawful means . . . then the deterrence rationale has so

5    little basis that the evidence should be received."  *Nix*, 467 U.S. at 444.

6            Here, the evidence in the record reflects that police officers and SWAT members

7    had established a perimeter around 1759 Seminary by at least 10:41 pm, according to

8    the CAD reports, well before the first Stingray device was deployed.  They had also sent

9    in a robot and bean bags and instructed residents to stay away from the windows,

10   believing that suspects were inside the building.  While the cell phone location

11   information obtained by the Stingrays facilitated locating Ellis in a specific apartment,

12   under these circumstances, the police would have eventually found Ellis inside and

13   apprehended him, even without the use of the Stingrays.  *See United States v. Takai*,

14   943 F. Supp. 2d 1315, 1324–25 (D. Utah 2013) (denying motion to suppress based on

15   warrantless cellphone GPS pinging data from cellular providers pursuant to 18 U.S.C.

16   § 2702(c)(4), where the defendant's location was already being staked out and discovery

17   was inevitable even absent the cellphone GPS pinging data).

18           Accordingly, the court finds that the inevitable discovery exception is a separate

19   ground for DENYING the motion to suppress.

20           **E.      Failure to Disclose Stingray in Pen Register Application**

21           Because the government relies on the pen register order to authorize the use of

22   the Stingrays, Ellis requests a *Franks* hearing based on the affiant's misleading

23   omissions in the pen register application about the use of cell site simulators by the FBI

24   and OPD.  Doc. no. 304 at 22 (citing *Franks v. Delaware,* 438 U.S. 154 (1978)).  Ellis

25   argues that the officer failed to disclose to the state court judge that MetroPCS would not

26   be conducting the surveillance, but that the FBI and OPD would each use Stingrays to

27   locate Ellis's phone.  Ellis contends that the application fails to particularize the

28   information to be collected from the Stingrays or from whom.  *Id.*  Ellis also argues that

31

United States District Court
Northern District of California

1 the OPD and FBI deliberately misled the state court judge by omitting any reference to

2 the use or capabilities of the Stingray devices in seeking the pen register order, and that

3 a *Franks* hearing is warranted by the government's misleading statements to the court.

4       As discussed above with respect to good faith reliance on the pen register

5 procedures, Officer Saunders's failure to explain that a Stingray device would be used by

6 law enforcement to locate the cell phone did not amount to a knowingly false statement

7 or reckless disregard for the truth, where such details of execution were not required to

8 be specified under *Dalia*, 441 U.S. at 258.  In *Patrick*, the Seventh Circuit rejected a

9 defendant's challenge to the failure of the police to disclose in a location-tracking warrant

10 application that they planned to use a cell-site simulator, implying that they would obtain

11 location information from his cell phone company's data.  *Patrick,* 842 F.3d at 544.  The

12 court in *Patrick* held that under *Dalia* and *Richards* (holding that no-knock entry in

13 executing search warrant was reasonable under the circumstances even though the

14 issuing judge denied the request for advance authorization for no-knock entry), "the

15 police could have sought a warrant authorizing them to find [a suspect's] cell phone and

16 kept silent about how they would do it."  *Id.*  The *Patrick* court reasoned that under the

17 authority of *Dalia* and *Richards,* and other considerations, "the Fourth Amendment *forbids*

18 judges to attempt to regulate, *ex ante,* how a search must be conducted, and confines

19 the judiciary to *ex post* assessments of reasonableness."  *Id.* at 544-45 (citing Orin S.

20 Kerr, *Ex Ante Regulation of Computer Search and Seizure*, 96 Va. L. Rev. 1241, 1260–

21 71 (2010)).  *See also United States v. Rigmaiden* ("*Rigmaiden III*"), 2013 WL 4525252, *5

22 (D. Ariz. Aug. 27, 2013) (denying motion for reconsideration of denial of suppression

23 motion, rejecting arguments that the tracking warrant lacked particularity and that the

24 government violated its duty of candor by failing to disclose additional technical details of

25 the mobile tracking device used to locate the defendant's aircard, following *Dalia*).

26       In light of these authorities, the omitted references to the Stingray devices at issue

27 do not demonstrate knowingly false statements or reckless omissions of material fact to

28 the state court so as to warrant an evidentiary hearing.  *See United States v. Stanert*, 762

1    F.2d 775, 781 (9th Cir.), *amended,* 769 F.2d 1410 (9th Cir. 1985) (requiring "that the

2    defendant make a substantial showing that the affiant intentionally or recklessly omitted

3    facts required to prevent technically true statements in the affidavit from being

4    misleading" to warrant a hearing under *Franks*).  Here, the pen register order authorized

5    the OPD and FBI to obtain real-time information about cell site/sector location and signal

6    direction and strength for Ellis's phone, the purpose of which was to determine the

7    location of Ellis's cell phone.  Doc. no. 304, Ex. I.  Under *Dalia* and *Chen,* and the

8    persuasive authority of *Patrick,* the OPD affiant was not required to disclose the use of

9    the Stingray devices to determine Ellis's cell phone location.  Accordingly, Ellis has not

10   demonstrated that a *Franks* hearing is warranted.

**F.     Possibility of Interceptions in Violation of Title III**

12        Ellis contends that if the Stingrays used by OPD and the FBI captured content or

13   were used as a microphone to pick up conversations, even if not recording or capturing

14   them, then their use violated Title III of the Omnibus Crime Control and Safe Streets Act

15   of 1968, 18 U.S.C. §§ 2510 et seq.  Doc. no. 304 at 19-20.  Title III requires an

16   application for an order authorizing interception of a wire, oral, or electronic

17   communication to establish probable cause to believe "that an individual is committing,

18   has committed, or is about to commit a particular offense," and probable cause to believe

19   that "particular communications concerning that offense will be obtained" by intercepting

20   communications over the targeted facilities.  18 U.S.C. § 2518(3).  Each application and

21   order must contain a "particular description of the type of communication sought to be

22   intercepted."  18 U.S.C. §§ 2518(1)(b)(iii) and (4)(c).

23        It is undisputed that neither the OPD nor FBI applied for an order for electronic

24   surveillance under 18 U.S.C. § 2518, and that the state court order did not authorize

25   interception of communications from the target phone.  Ellis points out that cell site

26   simulators are capable of intercepting conversations by using the target cell phone as a

27   microphone, and suggests that there is evidence to suggest that the police were listening

28   to conversations on his phone by using the Stingrays.  *See* doc. no. 304, Ex. O

United States District Court
Northern District of California

1    (USABook excerpt on electronic surveillance referring to the possibility of using Stingrays

2    to "intercept conversations using a suspect's cell phone as the bug").  Ellis cites the

3    police radio recordings of officers discussing "some activity on the phone right now" and

4    that "he's live on his uh every couple minutes."  Doc. no. 304-1 (Boersch Decl.) ¶ 19.

5    Ellis suggests that this evidence is inconsistent with the government's representations

6    that the Stingrays used in this case did not capture or collect content, but he merely

7    speculates that the Stingrays were configured to intercept conversations through his cell

8    phone.  The police officers' conversation about activity on the phone does not support an

9    inference that the content of the conversations were being intercepted, particularly in light

10   of the declarations by law enforcement officers who attested that the Stingrays did not

11   obtain or collect content or communications from the target cell phone.

12        The unnamed OPD operator states in his declaration that the OPD's cell site

13   simulator (1) "was not configured to capture the content of any communications, including

14   data contained on the phone itself;" (2) "does not remotely capture e-mails, texts, contact

15   lists, images, or other data from the phone, nor does it, as configured, provide subscriber

16   account information;" and (3) "[t]he device used to locate the defendant's cell phone

17   therefore did not capture, collect, decode, view or otherwise obtain any content

18   transmitted from the defendant's cell phone or any others in the area."  Doc. no. 321, Ex.

19   G ¶ 8 and Ex. H.

20        Similarly, the unnamed FBI agent's declaration indicates that "cell site simulators

21   used by Federal, state, and local law enforcement must be configured as pen registers,

22   and may not be used to collect the contents of any communication, in accordance with 18

23   U.S.C. § 3127(3)[, including] any data contained on the phone itself."  Doc. no. 321, Ex. I

24   ¶ 7.  The FBI agent further states, "[t]he cell site simulator does not remotely capture e-

25   mails, texts, contact lists, images, or other data from the phone, nor does it, as

26   configured, provide subscriber account information (such as an account holder's name,

27   address, or telephone number)."  *Id.*  With respect to the use of the FBI cell site simulator

28   on January 22, 2013, to locate Ellis's cell phone, "it only obtained the signaling

1    information relating to that particular phone[;] such signaling information did not include

2    content such as e-mails, texts, contact lists, images, or other data from the phone, nor did

3    it provide subscriber account information." *Id.* ¶ 11.  The FBI agent attests that "[i]n line

4    with general FBI policy and practice," the cell site simulator equipment was not

5    configured to collect (1) any content contained on or transmitted by the target device;

6    (2) subscriber account information; or (3) voice or other audio communications from any

7    device in the area, including the targeted device.  *Id.* ¶ 13.  *See also* doc. no. 321, Ex. J

8    ¶ 7 (Decl. of FBI Program Manager).

9            The evidence in the record is sufficient to determine that the cell site simulators

10   were not used to intercept conversations or other communications over cell phones in

11   violation of Title III.  *See United States v. Oliva*, 705 F.3d 390, 397-400 (9th Cir. 2012)

12   (affirming denial of motion to suppress where defendant argued that orders authorizing

13   government to intercept wire communications to and from certain target phones under

14   Title III could have given the government broader authority to convert the targeted

15   phones into roving bugs or roving wiretaps, where the government disavowed such

16   surveillance).  Ellis's motion to suppress for violation of Title III is therefore DENIED.

17   **II.      Ellis's Motion to Suppress Evidence Seized from Apt. 212**

18           Ellis seeks suppression of evidence seized from his apartment, No. 212, on the

19   ground that the government has failed to produce the original file-stamped search

20   warrant and warrant affidavit, and has thereby failed to demonstrate that the search of

21   Apartment 212 was conducted pursuant to a valid search warrant.  Alternatively, Ellis

22   seeks suppression of the evidence given the extraordinary delay from when the search

23   was conducted and when the search warrant was returned and filed with the state court.

24   Doc. no. 307.

25           **A.      Lack of Original Warrant**

26           Although the defense has not previously moved to suppress the search warrant for

27   lack of the original, the court has already addressed the validity of the search warrant for

28   Apartments 108, 110 and 212 in denying defendants' earlier motions to suppress.

United States District Court
Northern District of California

1   10/29/15 Order.  In brief, the court found that after police responded to the shooting of a

2   police officer the evening of January 21, 2013, OPD secured the apartment complex and

3   obtained a valid search warrant, supported by a showing of probable cause, to search

4   Apartments 108, 110 and 212.  Having reviewed the relevant evidence in the record,

5   including the factual statements in the unredacted search warrant affidavit based on

6   information provided by a confidential informant, filed under seal, the court determines

7   that despite the absence of an original file-stamped warrant, the record is sufficient to

8   determine that OPD conducted a search of Apartment 212 pursuant to a warrant.  *See*

9   Gov't Ex Parte Submission of Proposed Redactions to State Court Warrant Affidavits for

10  In Camera Review (filed under seal November 12, 2014).  Defense counsel's continued

11  objections to the court's reliance on redacted information to determine the validity of the

12  search warrants are overruled in light of the government's prior representations that the

13  informant will not be called to testify and the redacted information will not be offered at

14  trial to prove the charged conduct.  *See McCray v. Illinois*, 386 U.S. 300, 311 (1967);

15  *United States v. Fixen*, 780 F.2d 1434, 1439 (9th Cir. 1986).

16      Ellis also points out inconsistencies in the search inventory and police reports,

17  doc. no. 307 at 15, such as Officer Milina's failure to list the three handguns from

18  Apartment 212 in his report, Ex. Q, or the failure to list the handguns in the search

19  inventory, Ex. G.  The government responds that Milina's inventory does in fact refer to

20  "Box w/ 3 glock pistols" and that his report explains that he gave the firearms to

21  Technician Jaecksch, who documented them in her report, which explains the omission

22  of the guns from Milina's property record, Ex. T.  Doc. no. 322 at 9 (referring to Jaecksch

23  report at Bates 3447).

24      Ellis further takes issue with the fact that the police left a blank search warrant in

25  Apartment 212, which has no indication that portions were redacted, suggesting that

26  Judge Horner may have signed a blank warrant which would be overbroad.  Doc. no. 325

27  at 3-4 and Reply Ex. A.  This suggestion is purely speculative and unreasonable in light

28  of the record.  The government cites Officer Milina's declaration, filed in opposition to

36

United States District Court
Northern District of California

Ellis's earlier suppression motion, stating that he left a redacted version of the warrant per OPD policy.  Doc. no. 322 at 6-7 (citing doc. no. 95-4).  The government also compares the copy of the unredacted warrant produced to defendants with the redacted copy left at the scene, and points out there are no discrepancies in Judge Horner's signature and date.  Doc. no. 322 at 7.  Even if the police had not provided Ellis with any copy of the warrant, suppression of evidence obtained pursuant to a valid search warrant would not be justified.  *United States v. Hector*, 474 F.3d 1150, 1154-55 (9th Cir. 2007) ("On its face, the Fourth Amendment does not require that a copy of the warrant be served on the person whose premises are being searched.") (citing *United States v. Banks*, 540 U.S. 31, 35 (2003) ("The Fourth Amendment says nothing specific about formalities in exercising a warrant's authorization.")).

The government has demonstrated that the OPD and FBI applied for, and obtained, a search warrant for Apartment 212, as corroborated by the timeline of events and the warrants that were issued contemporaneously.  The years-long delay in locating and filing the original warrant that was issued by the state court judge may raise concerns about clerical operations after the search was conducted, but does not weigh against a finding that the police searched Apartment 212 pursuant to a warrant.  To the extent that Ellis challenges the failure to produce the original warrant, the lack of an original may impact admissibility of that document at trial, but does not so outweigh the evidence, demonstrating that a warrant was issued, as to require suppression of the fruits of the search.  Under Ninth Circuit authority, "California courts uniformly recognize that statutory provisions covering the filing and return of a search warrant are ministerial in nature, the violation of which does not in itself invalidate an otherwise lawful search or require suppression of evidence seized thereby, at least in the absence of demonstrated prejudice to the defendant."  *United States v. Towne*, 997 F.2d 537, 542 n.3 (9th Cir. 1993) (where the court file was missing an attachment incorporated by reference in a search warrant, court may consider extrinsic evidence to determine if attachment accompanied warrant when search was authorized and carried out, and whether to treat

1    the missing attachment as part of the warrant).  As defense counsel concedes, there is

2    no state court authority requiring suppression as a remedy for failure to comply with the

3    search warrant return procedures.  *See People v. Head*, 30 Cal. App. 4th 954, 958 (1994)

4    ("No California case has yet held that a late or otherwise faulty return violates the Fourth

5    Amendment.").

6              Accordingly, the fact that the original search warrant cannot be located in the state

7    court record does not establish that the warrant was invalid or that the search of

8    Apartment 212 was unreasonable.  The motion to suppress the evidence seized from

9    Apartment 212 for lack of the original search warrant is therefore DENIED.

10             **B.       Prejudice from Delay**

11             In the alternative, Ellis contends that he has been prejudiced by the government's

12   delay of nearly four years in filing the return of the search warrant in state court, which

13   has led to extensive litigation over producing the file-stamped warrant to determine its

14   validity.  He asserts that the delay has prejudiced all defendants by diverting time and

15   resources to litigating the issue and by extending the length of their pretrial detention,

16   particularly Ellis who has been in solitary confinement for most of that time.  Ellis further

17   argues that the delay raises uncertainty over the discrepancies in the copies of the

18   search warrant and the police records related to the search, particularly given that

19   defense counsel still cannot locate the original search warrant in the state court file.

20             The government accepts responsibility for the delay, almost three years after this

21   case was commenced in December 2013, in realizing that the original search warrant

22   and Ellis's arrest warrant had not been returned to the state court until September 2016

23   when they were discovered in the OPD's files that were in the FBI's custody.  Doc. no.

24   322 at 4.

25             Though the delay in locating the original file-stamped search warrant for

26   Apartments 108, 110 and 212 is ongoing and is now approaching four years, Ellis has not

27   demonstrated prejudice from this delay in light of the record.  In November 2014, the

28   court reviewed the search warrant affidavits in camera and approved certain redactions

1    proposed by the government.  The government represents that it produced a redacted

2    copy of the search warrant affidavit for Apartment 212 in December 2014, and a copy of

3    the warrant was subsequently produced in May 2015, after which the parties litigated

4    defendants' pretrial motions, including motions to suppress.  Doc. no. 322 at 2-3.  Thus,

5    defendants have had copies of the search warrant and redacted affidavit for over two

6    years, enabling defendants to challenge the probable cause showing and prepare a

7    defense.  Ellis has not shown that the lack of the original search warrant has been so

8    prejudicial as to merit suppression of the evidence.  *See United States v. Motz*, 936 F.2d

9    1021, 1025 (9th Cir. 1991) (suppression not warranted where the agents executed a valid

10   search and the defendants "were not prejudiced by the agents' failure to perform the

11   ministerial requirements" for return and inventory under Rule 41).

12           Accordingly, Ellis's motion to suppress evidence seized from Apartment 212 on

13   the ground of prejudicial delay is DENIED.

14           **IT IS SO ORDERED.**

15   Dated: August 24, 2017

16   _____

17   PHYLLIS J. HAMILTON
     United States District Judge

18

19

20

21

22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*